**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )          **Criminal No. 06-102-02 (JDB)** |
| | ) |
| DAVID SUCHIT | ) |
| | ) |
| Defendant. | ) |

## <u>Motion to Suppress Statements</u>

COMES NOW, David Suchit, by and through his undersigned counsel, and respectfully moves this Honorable Court, to suppress each[1] of his statements.    In support of this Motion, the defendant relies upon the attached Memorandum of Points and Authorities.

Respectfully submitted,

_____
Diane S. Lepley, Bar No. 368927
400 Seventh Street, N.W., Suite 400
Washington, D.C.  20004
(202) 393-0007
On Behalf of David Suchit

---

[1] The defense has set forth all of the defendant's conversations in the fact pattern to provide this Court with a context.  However, Suchit moves to suppress only those statements in which there was governmental action.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal No. 06-102-02 (JDB) |
| | ) | |
| DAVID SUCHIT | ) | |
| | ) | |
| Defendant. | ) | |

## Memorandum Of Points And Authorities In Support Of
## Motion to Suppress Statements

**Facts**

**The Charges**

David Suchit is charged with Conspiracy to Commit Hostage Taking Resulting In Death and

with Hostage Taking Resulting In Death, both in violation of 18 U.S.C.§1203(a) and each of which

requires a sentence of statutory mandatory life (or death )[2] upon conviction.  These charges are based

solely upon the defendant's own words to American and/or Trini Government agents.  No known

physical evidence connecting Suchit to either crime currently exists.[3]  This case involves the armed

forcible taking of an older gentleman from a bar by a group of individuals who are suspected of

many kidnapings and murders in Trinidad/Tobago.  These other defendants placed the victim in

restraints and held him in a desolate place where they repeatedly attempted to extract "proof of life"

---

[2] The Government already has elected not to proceed as a death penalty case.

[3] The Government has indicated during discovery that there may be telephone records tying Mr. Suchit to calls related to the kidnaping.   However, the Government does not appear to have those documents and, therefore, there has been no production of such evidence to date.

information from him.   They needed this information so that they could confirm that he was alive to his family who insisted upon obtaining the proof before they paid any ransom.   During his detention, he died.   The other alleged coconspirators cut him up and buried him in the jungle.  The defendant had no part in these events.

There is no allegation that the defendant participated in any way in the ultimate kidnaping of Balram Maharaj in Trinidad/Tobago (hereinafter "T/T") or that he played any role in his death. Instead, the prosecution will argue that Mr. Suchit was approached by another alleged co-conspirator, Anderson Straker, about participating in the crime but that the defendant's stalling led to the recruitment of other individuals to kidnap the decedent.

Despite his non-participation in that crime, the government will contend that Straker informed the defendant that he and others had proceeded with the kidnaping.  The Government's evidence will show that during one conversation between them, Suchit drove Straker in his vehicle to a telephone booth where Straker made a call(s) to a coconspirator(s) about the status of the kidnaping.  On another occasion, the Government will contend that the defendant took Straker to a location where he saw Straker meet with at least one other participant in the conspiracy.  Following his return to the car, Straker reportedly told Suchit that the other alleged coconspirators were "beating the man," thus giving Suchit information about the status of the ongoing crime.

Finally, the Government will allege that the defendant, at Straker's request, went to see the victim's former paramour who had instigated the kidnaping, to tell her that the decedent was, in fact, dead and to report to Straker about her reaction to this fact.   Thus, the Government's evidence, in its totality, will seek to demonstrate that David Suchit aided and abetted the hostage taking, as a driver and messenger, and that he conspired on collateral matters.

3

**The Defendant**

Thirty-two year old David Suchit was born in T/T on January 15, 1974.   He is the middle child of eight siblings with five brothers and two sisters.   He was raised in a single parent home where his father was merely the occasional visitor because he lived with another woman despite parenting all of Suchit's siblings.  Financial support came solely from his mother who was forced to become a farm laborer who tended to chickens.   They lived at the subsistence level. Consequently, at age 15, the defendant dropped out of school for monetary reasons when he began the first of many blue collar jobs.   Thus, his educational background does not rise to that of a high school graduate nor are his degrees of sophistication and life skills commensurate with those of the average 30 year old American.

Before being brought to the United States, Suchit had never been to America, nor did he have any knowledge about the American justice system.   Prior to his arraignment in this Court, he believed that the U.S. Government was required to extend to him the same promises that were extended to him by the Trinidad Government.

**The Rewards in Trinidad Following the Kidnaping**

The kidnaping of Balram Maharaj was notorious in T/T, with newspapers reporting often on the state of the investigation.  Crimestoppers,[4] announced the establishment of a local reward,[5] in an unknown amount, which apparently created no activity.  Consequently, on April 27, 2005 when the

---

[4]Crimestoppers is an international organization, implemented in more than 1100 communities, including the local chapter in Trinidad/Tobago, started in 1999, which announces rewards and administers the system for people to make anonymous calls reporting information about crimes and perpetrators in return for the payment of a reward.

[5]The defendant currently does not have information about the amount of this local reward or when it was initiated by authorities in T/T.

investigative trail appeared to be cold, the United States issued a press release setting forth the content of a second reward for information about the kidnaping and suspects. *See* **Exhibit A**. *See, also*, article from The Trinidad Guardian, dated April 28, 2005, entitled "US $10,000 reward for kidnap victim's release, **Exhibit B**.

Sometime in May, 2005, David Suchit called Crimestoppers in an effort to provide authorities with information about the kidnaping and to claim the reward. When one of his alleged co-conspirators prepared to flee Trinidad, the defendant made a second call to Crimestoppers. Suchit's identity was protected in accordance with the fundamental confidentiality promise of the Crimestoppers program which assigns unnamed contact codes to all callers. Although its 800 number apparently rings at one of the T/T police stations, it does not appear that the information imparted by Suchit was disclosed to the T/T authorities following either call. The specific content of both conversations is unknown, as Crimestoppers has declined to provide the information.[6]

**The Defendant's Statements**

**Calls to Crimestoppers**[7]

Although the exact wording used by Suchit when he called Crimestoppers is unknown, it is clear that the defendant did call the organization and told its representative that he knew about the kidnaping of Balram Maharaj, that he knew who did it and that the victim was dead. He was given a code to identify himself in future conversations and was promised anonymity for all purposes. Finally, he was asked to get additional information about the crime and the decedent. He did not call

---

[6]The Government's attempts to obtain this information have been futile.

[7]The defendant does not move to suppress these unknown conversations, as there is no known basis to make the request at this time. This information is related to provide the Court with a context in which the subsequent statements were made.

back with the requested information. However, he did make a second[8] anonymous call to report that Straker was leaving the country to travel to Canada.[9]

## Statements Involving Decedent's Brother[10]

Around September, 2005, the decedent's brother, Nimal, and the defendant had a conversation pertaining to the kidnaping of Balram Maharaj in which the defendant informed the brother that he knew who had committed that crime and that he had already made a report to Crimestoppers about it. Several days later, Nimal contacted Suchit and told him that a police officer wanted to talk with the defendant. Suchit was at Nimal's house when he was introduced to Officer Forbes, head of the T/T kidnaping squad. Upon questioning, Suchit again stated that he had called Crimestoppers and summarized what he had told them. The T/T police apparently had not been informed about the earlier tips by Crimestoppers, as Officer Forbes appeared to have no information about Suchit's telephone calls. The defendant declined to provide any further information. He indicated that he was concerned about the media coverage and his and his family's safety. Suchit indicated that he wished to maintain his anonymity promised by Crimestoppers.

A few days later, Forbes and Suchit met at Nimal's house where Forbes inquired about a telephone number to confirm that it belonged to Suchit and that he was the person who had called in the tips. Officer Forbes wanted to know how the defendant had gotten the information about the

---

[8]The dates when these two calls were made are unknown. However, the defense has requested that information from the Government.

[9]The specific content of that conversation is also unknown.

[10]The defendant also does not move to suppress any of these statements, the specific content of which is unknown, as there does not appear to be a basis at this time. Suchit has requested information about the content of these conversations in discovery.

kidnaping and he wanted Suchit to make a formal statement.[11]  Again, Suchit declined to do so.   At some point after this interview, Officer Forbes, for the first time, contacted FBI Agent Clauss and informed him about the defendant's tips to Crimestoppers.

**Working relationship between Trinidad and the United States**

The defense believes that the investigation of the Maharaj hostage-taking between T/T and the United States was a joint venture and was formalized by the Department of Justice and/or Department of State.[12]   It is clear from the countries' actions that the Trinidad authorities worked jointly with the United States agents to obtain information from Suchit.   After the meetings with him, Forbes and Nimal, the T/T police were responsible for all contact with Suchit from that time forward and every meeting and conversation with the defendant was run through them.

**Statement Made In The U.S. Embassy**

In the morning on the day before Agent Clauss interviewed Suchit for the first time, Officer Forbes and at least one other T/T police officer came to the defendant's house, placed him in handcuffs behind his back and told him he was under arrest.  He was put in the back seat of the police vehicle and taken to the Arouca Police Station.   When he arrived there, he was seated on a

---

[11]Upon information and belief, T/T has a special mechanism for taking statements of suspects called a "statement under caution."   In order to use a person's statement for all purposes, certain criteria, going to the statement's reliability, must be met.   The suspect is permitted to have an attorney, a family member or a friend present when the statement is given.   In addition, a judicial official interviews the suspect in private to make sure that the police are not doing anything underhanded.   Once these criteria are met, the suspect is allowed to review the document which is then signed by him.   This procedure is reserved for those who are charged with an offense in T/T.

[12]The defendant has requested information, during this discovery period, about the relationship and understandings between the two countries.  The defense has not been provided with this information yet.

hard chair with his hands and arms remaining in the same cuffed position. Suchit was told that he was going to be charged with withholding information and obstruction of justice if he did not make a statement about the Maharaj kidnaping. The defendant stated that he had nothing to say and asked to speak with an attorney. That constant request was repeatedly denied. When he asked to talk with his family, that too, was refused. When his wife and brother went to the station, they were not permitted to have contact with Suchit.

The defendant did not see a lawyer that day. Suchit was detained there for more than 24 hours, during which time he was given no food or drinks, nor was he allowed to go to the bathroom, except one time after he had "held it" for such a very long time that he was going to have to release it on himself. Finally, he was permitted a single bathroom trip. While he was seated in the station, multiple officers threatened him and one officer hit him on the top of his head with a large big book believed to be some type of station diary. These hits were precipitated because Suchit refused to speak at all after some time had passed. Finally, he made the statement, "I am deaf" at which point the officer picked up the book, swung it at Suchit's head and stated, "I'll give you back your hearing." When the defendant continued to be silent, he was struck again. At one point, another officer indicated that Suchit would be charged with the Maharaj kidnaping if he did not speak. Suchit remained silent except to state that the officers should "go ahead" and charge him so that he could go to the jail and call a lawyer.

Finally, on the day he ultimately was taken to the United States Embassy in T/T, Officer Forbes came back to see the defendant and told him that he was going to be taken from the station to talk with an FBI Agent. Officer Forbes promised Suchit that he would not be charged with any crimes and that he would be allowed to go home if he would tell the FBI Agent about the

Crimestoppers tip and the Maharaj kidnaping.

On the way to the embassy, the two T/T officers played "good cop, bad cop." Officer Forbes told Suchit what he should say, that he must tell the Agent the basis of his information and everything he knew about the kidnaping. The other officer said he would bring him back to the station and charge Suchit with kidnaping and obstruction if he did not get it right and do whatever Forbes said. Prior to leaving for the embassy, Suchit was allowed to go to the bathroom for the second time. The handcuffs were removed while Suchit was inside the police vehicle before he exited to enter the embassy. The defendant was told not to talk about the events of the earlier 24 hours, nor was he to ask again for a lawyer. Suchit did not tell Agent Clauss on October 4, 2005 what happened at the Arouca station the day before or what Officer Forbes said to him. The defense has no information that the FBI agent has ever been informed about it.

At all times that the defendant was at the embassy, T/T Officer Forbes, along with FBI Agent Clauss and the FBI legal attache were present. Forbes introduced Suchit to Agent Clauss whom he stated had called Crimestoppers. It was intended by everyone at the embassy, T/T and American officials alike, that Suchit would not be charged with any offense, but would be used solely as a witness. He was not given <u>Miranda</u> warnings, or warnings of any type.

At some point in the interview, it was confirmed to the defendant that he could get $10,000 US for his information. Suchit was promised that his identity would remain anonymous. He believed he would be protected by the Crimestoppers' credo and the promises of the T/T and American officials. The defendant made a lengthy statement, a copy of which is included with this motion. *See* **Exhibit C**. It is believed that this is the first statement which purportedly implicates

the defendant in the charged offenses.[13]   At the conclusion of the interview, Suchit was taken back

to the Arouca station and Forbes assured the defendant that he would not be charged with anything

and was free to go.

**Other encounters and statements at Arouca station**

_____In early January, 2006, a police officer told Suchit that he was to call Straker and create a ruse

so that the officers could locate the coconspirator and arrest him.  Suchit did what he was told to do

and Straker ultimately was arrested.  Later that month when co-conspirator Straker and Doreen were

arrested, Suchit was again placed in handcuffs and walked past Doreen.  Once Suchit identified

Doreen, his cuffs were removed and he was allowed to leave the police station.[14]

On January 8, 2006, two police officers came to Suchit's home, handcuffed him and took him

away to the Arouca Police station.  When Suchit arrived there, a police officer told him that the

defendant had to make a signed statement like the one that Suchit gave to the FBI and that the

defendant had to repeat its under oath in order to remain uncharged in the case.  The defendant was

promised that he would be given money and not face any charges connected with the Maharaj

kidnaping as long as Suchit did what he was told.  The defendant was not provided an attorney, nor

was he permitted to speak with anyone.  Suchit was informed that he would be placed in the T/T

witness protection program, given a monthly stipend and the Crimestoppers reward if he would

comply.  The officer showed Suchit an envelope containing $4000 TT which was given to him.  In

---

[13]The defendant bases this statement on the current discovery.  If the Government disagrees with this declaration, the defense would need additional information about these other statements to determine whether there is a basis to move to suppress them.

[14]The Government contends that this entire incident was also a ruse.  If so, Suchit, arguably, was acting as its agent when he was paraded through the station.

10

return for making the statement, Suchit was promised that he would not face charges, would receive money every month and that the officer would get him into the U.S. witness protection program.[15] Suchit was afraid of the coconspirators and he did not want to be arrested again. The defendant believed that his only way out was to go with his family to America to live.

This statement(s) was transcribed in handwriting and also was typewritten. *See* **Exhibits D and E**. The hand-written statement was entitled a "Statutory Declaration" which it is believed, is reserved for witnesses, not for criminal defendants. The executed cover sheet claims that the statement is true, voluntary, and not accompanied by threats. It was signed before a T/T Justice of the Peace.

On January 17, 2006, Suchit made another statement to Agent Clauss at the Arouca Police Station. *See* **Exhibit F**. At this point, Suchit indicated that he was afraid for himself and his family members' lives. He reported that Straker's relatives and unidentified men were coming to his home. The defendant reported that he believed that the unknown men were connected to coconspirator Leon Nurse, a member of the T/T Defense Force with contacts throughout the T/T government.[16] While the defendant was being provided money by T/T, had been relocated, he indicated that he wanted to be moved to America and did not want to be in the T/T program. Although Suchit made some changes from the earlier statement in October, 2005, the majority of his conversation dealt with the defendant's fears and security concerns.

––––––––––––––––––

[15] It is clear that the T/T authorities did not have the ability to bind the United States; however, that does not mean that they did not make that unwarranted promise.

[16] It was subsequently learned that police officers who had a relationship with Nurse and/or other co-conspirators were passing on information to them about the investigation of the kidnaping, including Suchit's role in it.

11

In March, Suchit, again, was brought to the Station, for which the timing is unknown.   He was again asked to make a second Statutory Declaration before a Justice of the Peace.   In this statement, he made certain changes to earlier statements.   *See* **Exhibit G**.

Information about Suchit's tip to Crimestoppers and his statements to authorities were passed along to one or more coconspirators.   Upon information and belief, Suchit contends that one of the codefendants had a relative who worked at the T/T police station.[17]   Almost immediately after he came to the Arouca station and made statements, people associated with the coconspirators visited his home from which he had to leave and hide for his and his family's personal safety.   He lived in this protected status until he was arrested at the direction of the United States.

**Defendant's Arrest and Final Statement**

Once Suchit made the earlier statements, reported herein, and did what he was told, he was assured that he was to be merely a witness, not a defendant.   At no time was Suchit informed that he had any criminal exposure.   In fact, the FBI Agent, himself, operated under that premise until March, 2006 when he was given orders to have Suchit arrested.   Prior to the defendant's arrest in April, 2006, he had never been given <u>Miranda</u> warnings because they were not deemed to be necessary or appropriate for a witness.

After Suchit was arrested, the newspapers publicly disclosed that the defendant had been the person who had called Crimestoppers.   In other words, he publicly was labeled a snitch.   In prison, he was always in danger.   He was beaten up repeatedly by other inmates.   He received threats from his co-defendants and on the last day, when he finally waived extradition, an inmate in the cell behind the courtroom showed him a knife and told Suchit that if he did not go into the courtroom

---

[17]The Government may have information suggesting this is true.

that very day and testify that he didn't know any of the co-defendants and that he was not going to be a witness, he would be killed.    On that same day, Officer Lucas, the head of the Homicide Division and the person who was now in charge of the investigation, promised Suchit that he would receive the same deal in the United States that he had gotten in Trinidad.

Faced with that imminent threat and believing representations of the T/T police, Suchit waived extradition and never returned to the jail in his country.  Rather, he was turned over to the FBI and flown to the United States.  While Suchit was in the T/T airport, he was given his rights under <u>Miranda</u> for the first time.  He reportedly waived his rights and continued to have conversations with the FBI agent.  During this last statement on June 28, 2006, Suchit discussed the threats made against him and all of his security concerns.  Believing that he was now going to become a witness here too with the arrangements he had in T/T, Suchit continued to talk to the FBI. *See* **Exhibit H**.  Suchit was mistaken.

The defendant finds himself in America, charged with the most serious and heinous of offenses without the benefit of any of the promises made to him in T/T.  His naivete, lack of knowledge about the American system, minimal education and life skills have led him to the defenseless place in which he finds himself, arguably overborne by the T/T officials and left to fend for himself now that his usefulness in T/T has been expended.

The defendant's statements must be suppressed because either they were the product of an illuegal seizure, they were involuntarily made and obtained in violation of <u>Miranda</u> and its progeny and/or any consent was not voluntarily and freely made.

13

## Argument

### A.    Nonresident aliens tried in the United States are Protected by the Fifth Amendment.

The United States may not use a statement of a nonresident alien at trial if a law enforcement official fails to give that individual <u>Miranda</u> warnings.    <u>Chavez v. Martinez</u>, 538 U.S. 760 (2002) (plurality opinion).    The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants.    <u>United States v. Verhugo-Urquidez</u>, 494 U.S. 259, 264 (1990).    The Fifth Amendment protects any person the United States commits to prosecute regardless of his nationality.    <u>United States v. Gouveia</u>, 467 U.S. 180 (1984).

One district court has reaffirmed these protections and held that FBI agents must make a detailed inquiry into the foreign nation's laws pertaining to <u>Miranda</u>-like rights and warnings and whether a suspect may talk with an attorney.    <u>United States v. Bin Laden</u>, 126 F. Supp. 2d 264 (S.D.N.Y. 2000).    <u>Bin Laden</u> suggests that a FBI agent should take steps so that the suspect enjoys the same rights he would have if he were interrogated in the United States, adhering to <u>Miranda</u>, as adjusted by the laws of the foreign country.    It is unknown whether such steps were taken or followed.

### B.    Suchit's Statements Are Not Admissible Because Miranda Was Violated and the Statements Were Coerced and Involuntary.

Defendant Suchit's statements were obtained in violation of the dictates of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) and its progeny.    In <u>Miranda</u>, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."    <u>Id.</u> at 444.    Statements are inadmissible unless the police advise the individual of certain constitutional rights that exist throughout custodial interrogation.    Only after

14

such a proper advisement of rights and a knowing and intelligent waiver of such rights by the defendant may statements be admitted into evidence.  Id.  The Government bears a heavy burden of proving a knowing, intelligent and voluntary waiver.  Brewer v. Williams, 430 U.S. 387 (1977). The Government cannot meet this requirement.

The burden rests with the Government to show that Mr. Suchit's statements were voluntary. Lego v. Twomey, 404 U.S. 519 (1972).  The test is whether the statement(s) is "the product of an essentially free and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973).  Thus, the Government must prove that the totality of the circumstances surrounding any confession, see, Clewis v. United States, 386 U.S. 707 (1967), shows that Mr. Suchit had a free will and intellect.

Courts have considered numerous factors in determining whether a confession is involuntary. For example, the courts have reviewed the presence of any psychological or physical coercion by the police.  See, Brown v. United States, 297 U.S. 278 (1936).  The Courts have also examined whether the individual was informed of his Miranda rights, the adequacy of such warnings, and the circumstances surrounding any purported waiver of such rights.  See, e.g., Branch v. United States, 631 F. 2d 1229 (5th Cir. 1980).

The Court shall exclude the statement of a suspect who invokes his right to have counsel present during custodial interrogation and that request is not honored.  Edwards v. Arizona, 451 U.S. 477 (1981).  The response to further questioning must be suppressed, even if the Federal agent provides a fresh set of warnings which the suspect waives.   Such statement must also be made voluntarily before it can be admitted into evidence.  Malloy v. Hogan, 378 U.S. 1 (1964).  Coercion solely at the hands of foreign officials may lead to the exclusion of involuntary statements forced by

the actions of foreign police.    Bram v. United States, 168 U.S. 532 (1897).    The totality of the circumstances should be considered whether a statement is voluntary and admissible when the statement is coerced by foreign authorities.    United States v. Welch, 455 F. 3d 211 (2d Cir. 1972).

Suchit's status as a citizen of Trinidad does not preclude the protections of the Fifth and Sixth Amendments.    Not until he was on the plane to America did he receive his Miranda rights, some six months after multiple statements had been obtained in the interim period.  He received no warning in the U.S. Embassy.  His first statement to FBI Agent Clauss at the Embassy was made after his  custody in Trinidad for more than 24 hours at the hands of foreign officials who hit him and deprived him of sensory needs and necessities.  A statement made under such conditions must be suppressed.

Statements that are extracted by . . .threats or violence" violate the Due Process Clause. Hutto v. Ross, 429 U.S. 28, 30 (1976).    A statement given under a "credible treat" of violence is enough to render it involuntary and therefore inadmissible at trial.    Arizona v. Fulminante, 499 U.S. 279, 287 (1991).    Suchit was hit and threatened while in custody of the Trinidad government in anticipation of the arrival of Agent Clauss.    In addition to the threats, the T/T officials made promises to induce his first statement.  The Government cannot bear its burden that this was a statement that was voluntarily made.

## C.    Subsequent Statements Were Tainted by the First Inculpatory Statement and Must Be Suppressed.

The statements made after the initial "confession" at the embassy were tainted.  Coercive or improper tactics were used by the T/T officials in obtaining the first statement.    Thus, the subsequent administration of Miranda warnings to Suchit will not remove the taint and  necessarily allow their admissibility.   The making of an unwarned admission does not warrant a presumption

of compulsion.  Oregon v. Elstad, 470 U.S. 298 (1985).  The relevant inquiry is whether, in fact, the second statement was...voluntarily made.  The entire course of police conduct must be examined.  In this case, Miranda warnings were not given until April.  Every statement before that date must be suppressed as violating constitutional protections and Miranda.  Moreover, admission of the subsequent statements would run afoul of the requirement that the statement be voluntary and that any waiver be a knowing and intelligent one.

        The United States coordinated and collaborated with Trinidad in effectuating the seizure and interrogation of Suchit.  The countries acted jointly and the United States should be held accountable for any actions of the T/T officials.

        After the Court reviews the totality of circumstances in the instant matter, the Court will find that the purported statements were not made voluntarily and/or intelligently or that the dictates of Miranda were met.

        WHEREFORE, for the reasons stated herein, the defendant requests that this motion be granted.

                                        Respectfully submitted,

_____

_____
                                        Diane S. Lepley, Bar No. 368927
                                        400 Seventh Street, N.W., Suite 400
                                        Washington, D.C.  20004
                                        (202) 393-0007

17