UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )   Criminal No. 06-102-02 (JDB) |
| | ) |
| DAVID SUCHIT | ) |
| | ) |
|     Defendant. | ) |

## MOTION TO RETURN DEFENDANT TO COUNTRY OF ORIGIN

COMES NOW, David Suchit, by and through his undersigned counsel, and respectfully moves this Honorable Court, to return him to his country of origin, Trinidad/Tobago, because his consent to extradition was not knowing and voluntary. In support of this Motion, the defendant relies upon the attached Memorandum of Points and Authorities.

Respectfully submitted,

---

Diane S. Lepley, Bar No. 368927
400 Seventh Street, N.W., Suite 400
Washington, D.C. 20004
(202) 393-0007
On Behalf of David Suchit

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| v.    ) | Criminal No. 06-102-02 (JDB) |
| ) | |
| DAVID SUCHIT    ) | |
| ) | |
| Defendant.    ) | |

**Memorandum Of Points And Authorities In Support Of
Motion To Return Defendant To Country Of Origin**

**Facts**

David Suchit was arrested in Arouca, Trinidad on April 27, 2006 pursuant to a provisional extradition warrant from the United States. During the initial hearing in Trinidad, the defendant was described as "dazed-looking," see "Five To Face US Court," The Trinidad Guardian, April 28, 2006 and "bewildered," see "US Grand Jury Indicts Four In Soldier's Kidnap," The Trinidad Express, April 28, 2006. Reportedly, he "placed his finger to his head and asked [the Chief Magistrate] what he 'was alleged to have done.'" Id. the Guardian. "After the charges were read, Suchit seemed to be even more confused, leading the Chief Magistrate to read the charge again." Id. The Express. The newspaper noted that Suchit had not been charged locally with any crime and was not wanted by the local law enforcement in connection with the kidnaping charges against Maharaj. The Express went on to report that Suchit was "wanted only by the US authorities, so the charge pertaining to the extradition was the only charge read to him." The newspapers distinguished

Suchit's legal situation from those charged with the Maharaj hostage-taking.

On May 6, 2006, the Trinidad Guardian called Suchit a "State witness." See "Ballram Maharaj Murder Inquiry Starts Next Week," Trinidad Guardian, May 6, 2006. This label, tantamount to the American version of snitch, caused the defendant to break down into tears on June 12, 2006 when his case was continued again for two more weeks. Finding himself in the courtroom with four co-defendants, Zion Clarke, Private Ricardo De Four, Sgt. Leon Nurse, and Kevon Demerieux, two of whom were dangerous Defence Force soldiers, Suchit tried to protect himself by "blurting out 'I lock up (sic) since the 20th of April. It is overbearing. I don't even know these other people who are charged with me...[I have seen that I am] going to be a witness against the other wanted persons. That is not true, I never saw them before I came to court. I only (sic) coming to court and going back to prison. I am getting frustrated. I know nothing about that.'" See "Kidnaping Of US War Veteran" Trinidad & Tobago's Newsday, June 13, 2006.

From the inception of his incarceration until almost 60 days had passed, the defendant maintained his rights as a citizen of T/T. Although the United States had expected him to agree to come to America as soon as he was arrested, he did not do so. However, on June 26, 2006, on approximately the last day before the US provisional warrant would have lapsed, Suchit consented to the extradition. Prior to coming into the courtroom on that day, he was threatened again at knife point about his testifying and told that if he didn't recant his knowledge about the crime, he would be killed when he returned to the prison. As he had been during the entire time he was in the T/T jail, he was frightened by the renewed threat, having been beaten up on several occasions during his incarceration. This perceived danger, coupled with what he believed to be his protected status, led to his consent to extradition. At the time that he executed that waiver, he was not aware that his

legal status in America would differ from what it had been in Trinidad. In fact, T/T officials promised him, prior to the waiver, that he would be given the same "deal" in the United States that he had in T/T. Before he reached American soil, no one ever told him that he would be required to enter a guilty plea to criminal charges or stand trial with his co-defendants. While Suchit was in T/T, he was treated like a witness. He received regular stipends, was asked to change his address and was never told he would be charged with any crime. In many of his statements, he talks about security issues and his concerns about his and his family's safety.[1]

**ARGUMENT**

**Suchit's consent to extradition was not knowing and voluntary.[2]**

A valid consent obviates the need for constitutional protections where the consent is voluntary and knowing. For example, police may search a person's body, home or possessions without a warrant or probable cause if consent has been obtained. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). Such claims are therefore subject to strict scrutiny. See Bumper v. North Carolina, 391 U.S. 543 (1968). Thus, the Government must prove that the consent "was voluntarily given, and not the result of duress and coercion, express or implied." Schneckloth, 413 U.S. at 248-249. Account must be taken of the possibly vulnerable subjective state of the person who consents. Id. Special scrutiny should be given to any consent allegedly obtained after a client is arrested, restrained, and questioned by police. See, e.g., United States v. Rothman, 492 F.2d 1260, 1264-65

---

[1] The facts and exhibits set forth in the Defendant's Motion To Suppress Statements are incorporated by reference.

[2] The defendant is arguing the law on consent to searches, not consent to extradition, by analogy, as the defense has not located any case law on involuntary or coerced consent to extradition. This may be an issue which must be raised in Trinidad, not in the United States, but defendant Suchit is now located here.

(9th Cir. 1974)(consent involuntary despite giving of Miranda warnings, where defendant was arrested, handcuffed and questioned by three officers for two hours).  The psychological atmosphere in which the consent is obtained is a critical factor in the determination of voluntariness." Rothman, 492 F.2d at 1265.

In the instant case, Suchit never received any Miranda warnings until **after** he consented to extradition and was in the custody of FBI Agent Clauss.  There is no indication that he was ever told before reaching America that he would be required to stand trial or enter a guilty plea to the indicted charges once he came to the United States.  The consent to extradition came on the heels of repeated threats and disclosure that he was a government witness.   At all times prior to his arrest, he was treated like a witness, not a defendant.  Thus, when defendant Suchit "consented" to be extradited, he did not do so knowingly or voluntarily.   For that reason, the  defendant contends that he should be returned to his country of origin for additional proceedings consistent with this court's ruling.

WHEREFORE, for the reasons stated herein, the defendant requests that said motion be granted.

Respectfully submitted,

_____
Diane S. Lepley, Bar No. 368927
400 Seventh Street, N.W., Suite 400
Washington, D.C.  20004
(202) 393-0007