IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| | § | |
| - vs - | § | CRIMINAL No.   06-102-02 (JDB) |
| | § | |
| | § | |
| **DAVID SUCHIT,  *el al.*** | § | |
| | § | |
| Defendants. | § | |
| | § | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT SUCHIT'S MOTION TO SUPPRESS STATEMENTS

The United States of America ("United States" or "Government") opposes defendant David Suchit's Motion to Suppress Statements ("Defendant's Motion") because Mr. Suchit's statements were freely and voluntarily given by him, in a foreign country.  As a result, Mr. Suchit's statements were not subject to the American jurisprudence strictures of *Miranda*. Moreover, even if his statements were subject to *Miranda*, Mr. Suchit's Motion should be denied, because Mr. Suchit's statements were not the result of custodial interrogation.

### *Nature of the Case*

Defendant David Suchit ("Mr. Sucht" or "defendant') is one of twelve Trinidadian nationals who have been indicted in the District of Columbia for Conspiracy to Commit Hostage Taking Resulting in Death and with Hostage Taking Resulting in Death, both charges being in violation of 18 U.S.C. § 1203(a).  According to the allegations of the superseding Indictment, beginning on or about February 1, 2005 and ending on or about April 15, 2005, Mr. Suchit and his co-conspirators, embarked upon a common plan to obtain the money of American citizen,

Balram Maharaj, who was a visitor to the Island of Trinidad and who had relatives there.  The conspirators' initial plan was to kidnap Mr. Maharaj's 5-year old son, Dinesh Maharaj, and to hold Dinesh for ransom.  However, the conspirators later discarded the initial plan and determined to kidnap Balram Maharaj and sought to obtain a ransom of Mr. Maharaj's money, from Mr. Maharaj's relatives, for his release.  On April 6, 2005, in accordance with their plan, Balram Maharaj was abducted. and a ransom of $3,000,000 Trinidad (approximately $500,000 US) was demanded for his release.  Mr. Maharaj was held captive at a hideout in a mountainous jungle region of Trinidad.  On or about April 13, 2005, Mr. Maharaj expired at the remote hideout, as he languished in the hands of the conspirators.  Following Mr. Maharaj's death, members of the conspiracy dismembered his body and buried his body parts at another remote location in the mountainous jungle.

By April 15, 2005, the ransom demands had ceased.

On April 27, 2005, the United States Embassy issued a press release, *inter alia*, offering a reward of $10,000 US for information leading to the location of Mr. Maharaj and to the arrest and conviction of those responsible for the abduction of Balram Maharaj.

In January of 2006, Mr. Maharaj's dismembered and decomposed body was located in a mountainous jungle region in Trinidad.

<u>The Parallel Investigations</u>

With the brazen armed abduction on April 6, 2005, of Mr. Maharaj, from the well-attended Samaan Tree Bar in Trinidad, and the initial ransom demand to the victim's family, the Trinidad & Tobago Anti-kidnapping Unit embarked upon a vigorous investigation.  Because Mr. Maharaj was a United States citizen, the Trinidadian officials notified the United States Embassy

in Trinidad. Thereafter, the United States inquired of the Trinidadian Government if the Federal

Bureau of Investigations ("FBI") would be permitted entry into Trinidad to conduct its own

investigation and to coordinate with the Trinidadian authorities. Permission was granted.

Thereafter, members of the FBI Miami Office made numerous trips to Trinidad to follow

up leads and to interface with the Trinidadian authorities, sharing information as it developed.

Although there was certainly cooperation, and some coordination, between the two sovereigns,

neither directed or controlled the investigation of the other.

### Suchit Telephone's the Trinidadian "Crime Stoppers" Seeking a Reward

On or about May 5, 2005, Mr. Suchit initially telephoned the Trinidadian "Crime

Stoppers," seeking to obtain a reward, and offered information concerning the abduction and

death of Mr. Maharaj. [*See* Motion, pages 5-6; Exhibit 17 (Selected telephone records of Suchit)]

At that time, Mr. Suchit provided information that Mr. Maharaj was dead and that Mr. Maharaj

had been kidnapped by a group that included his friend, Anderson Straker aka Gypsy's Son, aka

"Andy," Doreen Alexander, and another conspirator known as "Leo." Mr. Suchit sought a

reward for the provision of this information. [*See* Motion, page 5] Mr. Suchit was provided by

Crime Stoppers with a code (by which to identify himself) and was asked by Crime Stoppers to

obtain additional information about the crime and the decedent. [*See* id.] Mr. Sucht made at least

one more call to Crime Stoppers, this time to report to them that Straker was leaving Trinidad for

Canada. [*See* Motion, page 6]

Mr. Suchit does not move to suppress these statements, as no theory for their suppression

is seen. [Motion, page 5, footnote 7]

**Suchit's Admissions to the Victim's Brother**

In his Motion, Mr. Suchit says that around September of 2005, Mr. Suchit and the decedent's brother ("Nimal") at which time Mr. Suchit informed the decedent's brother: (1) he knew who had committed the crime; and (2) he had already made a report about it to Crime Stoppers. [Motion, page 6]  According to Defendant's Motion, several days later, "Nimal" contacted Mr. Suchit and arranged for Mr. Suchit to meet with the police.  Thereafter, Mr. Suchit met at "Nimal's" house with Officer Forbes of the Anti-kidnapping Unit.  At that time, Mr. Suchit "again stated he had called Crime Stoppers and summarized what he had told them.  The T/T police apparently had no been informed about the earlier tips by Crime Stoppers, as Officer Forbes appeared to have no information about Suchit's telephone calls" to Crime Stoppers. [Motion, page 6]  A few days later, Mr. Suchit met again at "Nimal's" house with Officer Forbes and provided additional information. [*See* id.]

Mr. Suchit does not move to suppress these statements, as no theory for their suppression is seen. [Motion, page 6, footnote 10]

## THE ALLEGATIONS OF DEFENDANT'S MOTION

### The Statements Sought to be Suppressed

In addition to the statements referenced above, Mr. Suchit has made numerous statements to various law enforcement personnel variously of Trinidad and of the United States.  The following is a list of memorialized statements from Mr. Suchit to law enforcement personnel that are currently know to the Government:

1. September 28, 2005 Memorandum of TT Constable Forbes concerning interview with Suchit. [Exhibit 1]

-4-

2.      October 4, 2005 FBI-302 by S.A. Clauss. [Exhibit 2]

3.      October 6, 2005 Memorandum of TT Constable Forbes concerning interview with Suchit. [Exhibit 3]

4.      October 7, 2005 Memorandum of TT Constable Forbes concerning interview with Suchit. [Exhibit 4]

5.      January 8, 2006 Handwritten Statement of Suchit (12 pages)   [Exhibit 5]

6.      January 9, 2006 Statutory Declaration by Suchit before Justice of the Peace reaffirming 12-page Statement of January 8, 2006. [Exhibit 6]

7.      Undated typewritten Statement signed by Suchit (2 pages). [Exhibit 7]

8.      January 26, 2006 typewritten Statement signed by Suchit (2 pages). [Exhibit 8]

9.      February 17, 2006 FBI-302 by S.A. Clauss. [Exhibit 9]

10.     March 1, 2006 Handwritten Statement of Suchit (2 pages). [Exhibit 10]

11.     March 1, 2006 TT Witness Protection Receipt signed by Suchit ($2,300 TT/Groceries). [Exhibit 11]

12.     March 1, 2006 TT Witness Protection Receipt signed by Suchit ($1,500 TT/Subsistence). [Exhibit 12]

13.     March 3, 2006 Statutory Declaration by Suchit before Justice of the Peace reaffirming 2-page Statement of March 1, 2006. [Exhibit 13]

14.     April 4, 2006 TT Witness Protection Receipt signed by Suchit ($1,500 TT/Groceries). [Exhibit 14]

15.     April 4, 2006 TT Witness Protection Receipt signed by Suchit ($1,500 TT/Subsistence). [Exhibit 15]

16.     June 28, 2006 FBI-302 by S.A. Clauss. [Exhibit 16] (and see Advice of Rights [Exhibit 16-A])

With the exception of the four receipts for money from the Trinidadian Witness

Protection (Numbers 11, 12, 14 & 15, above), it appears Mr. Suchit seeks to suppress each of

these statements by him.  As the general basis for suppression, Mr. Suchit's Motion claims,

without support, that the "United States coordinated and collaborated with Trinidad in

effectuating the seizure and interrogation of Suchit.  The countries acted jointly and the United

States should be held accountable for any actions of the T/T officials." [Motion, page 17]

Additionally, the Motion says Mr. Suchit's "statements must be suppressed because either they

were the product of an illegal seizure, they were involuntarily made and obtained in violation of

Miranda and its progeny and/or any consent was not voluntarily and freely made."  [Motion, page

13]

      However, with regard to certain of his statement, Mr. Suchit makes specifically factual

allegations:  (1) the October 4, 2005 Statement to the FBI at the U.S. Embassy; (2) the January 8,

2006 Statement to Trinidadian officials; (3) the January 17, 2006 Statement to the FBI; (4) the

March 1, 2006 Statement to Trinidadian officials; and (5) the March 28, 2006 *Miranda-ized*

Statement to the FBI.  The bases alleged by Mr. Suchit for each of these statements will be

examined *seriatim*.  Because each these statements were taken in Trinidad & Tobago,[1] and

because some of the statements were taken by Trinidadian authorities and others by the FBI, and

because some of the statements were subsequently re-affirmed by Mr. Suchit before a Justice of

the Peace, and because one of these statements occurred after Mr. Suchit had waived his *Miranda*

rights, in its Opposition, the Government will first identify the allegations of Mr. Suchit for the

---

[1] Following Mr. Suchit's arrival in the United States, he agreed to, and did, submit to a
debriefing conducted under a written *Kastigar* Agreement.  Mr. Suchit's counsel has been
provided with a copy of the FBI-302 memorializing Mr. Suchit's statements made during those
debriefings (at which she was present.)  In accordance with the terms of the Agreement, the
United States will not seek to introduce any statement made by Mr. Suchit under the Agreement,
unless Mr. Suchit should make a contradictory statement in a judicial proceeding.

statement in question and will then set forth a brief "Contra" statement of facts and observations.

### The October 4, 2005 Statement to the FBI at the United States Embassy

In his Motion, Mr. Suchit claims that on the morning of October 3, 2005 (the morning before the statement), Trinidadian Anti-kidnapping Constable Forbes and at least on other Trinidadian Police official came to Mr. Suchit's house, placed him in handcuffs, told him he was under arrest, and took him to the Arouca Police Station. [Motion, page 7] Once there, according to the Motion, Mr. Suchit was told by the Trinidadian authorities that he would be charged with withholding information and obstruction of justice if he did not make a statement about the Maharaj kidnapping.  Allegedly, Mr. Suchit asked to speak with an attorney and his family members, but his requests were denied. [Id.] Mr. Suchit's Motion claims he was detained for more than 24 hours with no food, no drink, and that he was only once allowed to go to the bathroom. [Id.]  While at the Police Station, Mr. Suchit claims, he was threatened and a Trinidadian Officer hit him on top of his head with a large book (perhaps a Station Diary). [Id.] At some point, a Trinidadian Officer indicated to Mr. Suchit that, if he did not speak,  he would be charged with the Maharaj kidnapping.  [Id.]  In response, Mr. Suchit claims, he challenged the Officer to charge him with the threatened offenses. [Motion, page 8]  On October 4, 2005 (the day Mr. Suchit  went to the United States Embassy in Trinidad & Tobago), Trinidadian Constable  Forbes allegedly told Mr. Suchit that Suchit would be taken to talk with an FBI Agent.  According to the Motion, Constable Forbes promised Mr. Suchit he would not be charged with any crimes, and would be allowed to home, if  he would tell the FBI Agent about Suchit's Crime Stoppers tip and the Maharaj kidnappping. [Motion, pages 8-9]  On the way to the United States Embassy, Mr. Suchit was allegedly told he must tell the FBI everything he

knew or else he would be taken back to the Station and charged with kidnapping and obstruction. [Motion, page 9]  Prior to leaving for the United States Embassy, the Trinidadian officials removed the handcuffs from Mr. Suchit and he was told not to talk about the events of the preceding 24 hours and he was instructed not to ask for a lawyer. [Id.]

At the United States Embassy, Mr. Suchit was not given *Miranda* warnings. [Motion, page 9] However, according to his Motion, Mr. Suchit was promised he would get the $10,000 reward money and that his identity would remain anonymous.  Thus, Mr. Suchit's Motion says, "He believed he would be protected by the Crime Stoppers' credo and the promised of the T/T and American officials," and he proceeded to make a lengthy statement.  [Motion, page 9]  DS made the lengthy statement (admitted to be that statement in Exhibit C).  Further, the Motion says, "It is believed this is the first statement which purportedly implicates the defendant in the charged offenses." [Motion, pages 9-10]

Because Mr. Suchit's "first statement to FBI Agent Clauss at the Embassy was made after he was in custody in Trinidad for more than 24 hours at the hands of foreign officials who hit him and deprived him of sensory needs and necessities," Mr. Suchit's resulting statement should be suppressed.  [Motion, page 16]

**Contra**:  Mr. Suchit's self-serving claims are fanciful, at best.  In fact, Mr. Suchit claims of his virtual abduction on October 23, 2005, by Constable Forbes and his detention and mistreatment at the Trinidadian Police Station is a figment of his imagination.   He was not abducted or abused by the Trinidadians.  In fact, prior to his meeting with the FBI Agents at the United States Embassy, Mr. Suchit bragged that he was going to meet the FBI at the Embassy and was excited about it.  It is true, but of no moment, that Mr. Suchit was not provided *Miranda*

warnings by the FBI at the October 4, 2005 interview at the United States Embassy.   This is so, because: (1) at the time of the interview, Mr. Suchit was not in custody (and hence *Miranda* would not have applied, even if the interview had occurred in the United States), and (2) at the time, Mr. Suchit was viewed as a witness and not as a target.  As Mr. Suchit made clear to the FBI at the time – just as he had with his calls to Crime Stoppers and his interviews with the Trinidadians -- his motivation for providing information on his friends to the authorities was solely to obtain the reward that was offered for such information.

Moreover, it should be noted that Mr. Suchit's Motion does not claim the FBI participated in, or had any knowledge of, any of the alleged misdeeds he attributes to the Trinidadian authorities leading up to his October 4, 2005 interview by the FBI..

<u>The January 8, 2006 Statement to Trinidadian Officials</u>

According to Mr. Suchit's Motion, in early January of 2006, a Trinidadian Police official told Mr. Suchit that "he was to call Straker and create a ruse so that the officers could locate the coconspirator and arrest him.  Suchit did what he was told and Straker ultimately was arrested." [<u>Motion</u>, page 10]   Later that month, when co-conspirator Straker and Doreen were arrested by the Trinidadian authorities (on Trinidadian murder charges), Mr. Suchit was "placed in handcuffs and walked past Doreen.  Once Suchit identified Doreen, his cuffs were removed and he was allowed to leave the police station." [<u>Motion</u>, page 10]   Thereafter, on Janurary 8, 2006, two Trinidadian Police officials came to Mr. Suchit's home, handcuffed him,  and took him to the Arouca Police Station. [<u>Id</u>.]  Once there, Mr. Suchit was told he had to make a signed statement "like the one that Suchit gave to the FBI" and Mr. Suchit was required to repeat it under oath to remain uncharged in the prosecution of the Trinidadian homicide case.  [<u>Id</u>.]  Mr. Suchit was

promised he would be given money and not charged, so long as he did what he was told.  [Id.] If

he complied, Mr. Suchit was told, he would be placed in the Trinidadian Witness Protection

Program, given a monthly stipend, and the Crime Stoppers reward.  [Motion, page 10]  The

Trinidadian Officer gave Mr. Suchit an envelope containing $4,000 TT. [Id.]  At the time, Mr.

Suchit was promised by the Trinidadian authorities that he would be given a monthly stipend and

he would be gotten into the United States' Witness Protection Program. [Motion, page 11]

According to his Motion, because Mr."Suchit was afraid of the coconspirators" and he because

did not want to be arrested again, he cooperated with the Trinidadian authorities.  [Motion, page

11]

      **Contra**:  Mr. Suchit's efforts to rewrite history are unavailing.  As is readily seen, Mr.

Suchit's 12-page handwritten statement, dated January 8, 2006, is signed by him on each page.

[*See* Exhibit 5   Thereafter, on January 9, 2006, Mr. Suchit was taken before a Justice of the

Peace in East St. George, Trinidad, where he signed the Statutory Declaration [Exhibit 6][2] in

which he declares, as to the 12-page Statement attached to the Declaration, *inter alia*:

> 3.      That ***no*** promises or ***threats were made to me, nor any force used to me***
> to induce me in any way to give the said statement which I have signed.

> 4.      ***I have made this statement voluntarily*** and on my own free will.

> I make this declaration conscientiously believing the same to be true and
> according to the Statutory Declaration Act, and I am aware that if there is any
> statement in this declaration which I know or believe to be false or do not believe
> to be true, I am liable to fine and imprisonment.

[Exhibit 6, page 1 (emphasis provided)]

---

[2]  In his Motion, Mr. Suchit admits the "Statutory Declaration" was signed by him "before
a T/T Justice of the Peace." [Motion, page 11]

In fact, no threats or force were used by the Trinidadian officials against Mr. Suchit. In fact, Mr. Suchit's Statement of January 8, 2006 was voluntarily made by him. In fact, Mr. Suchit was never arrested in January of 2006 by the Trinidadians, nor was he threatened at that time with arrest. Mr. Suchit's new-found allegations of abuse ring hollow, among other reasons, when held next to his Declaration made by Mr. Suchit before Trinidadian Judicial Officer on the day after the statement complained of, in which he unequivocally declares that no threats were made against him, nor force used against him, and that his Statement was voluntarily given. While it may be true that Mr. Suchit was "afraid of the coconspirators," as his Motion claims, such a fear cannot support the relief sought in his Motion. To the contrary, Mr. Suchit's claimed fear of his co-conspirators must have visited a strong motivational force on Mr. Suchit voluntarily to cooperate with the Trinidadian authorities; which is what he did.

Finally, it bears noting, Mr. Suchit's Motion does not claim the FBI participated in any of the alleged misdeeds of the Trinidadian authorities.

<u>The January 17, 2006 Statement to the FBI</u>

Mr. Suchit's Motion claims that Mr. Suchit's second Statement to FBI S.A. Clauss (this time at the Arouca Police Station) was made by him while he:

> [W]as afraid for himself and his family members' lives. He reported that Strakers' relatives and unidentified men were coming to his home. The defendant reported he believed that the unknown men were connected to coconspirator Leon Nurse, a member of the T/T Defense Force with contacts throughout the T/T government.

[Motion, page 11] According to his Motion, at the time of his January 17, 2006 Statement, Mr. Suchit "was being provided money by T/T, had been relocated" by the Trinidadian authorities.

[*See* <u>Motion</u>, page 11] During this interview with the FBI, Mr. Suchit "made some changes from

the earlier statement in October, 2005," but spent the majority of the conversation voicing his "fears and security concerns." [Motion, page 11]

**Contra:**    The basis for the Motion's prayer for suppression of this Statement is generally a mystery to the Government.  Indeed, Mr. Suchit's Motion does not specifically allege he was coerced by the FBI (nor by the Trinidadian authorities, for that matter) into making his January 17, 2006 Statement to the FBI.  He does not claim that he was in custody at the time of his Statement.  Hence, even if he had been in the United States, *Miranda* would not have applied. Further, as previously observed, Mr. Suchit's claimed fears of his co-conspirators are naturally a powerful motivating force for him voluntarily cooperate with the authorities.  His claim that, by that time, he had already been relocated by the Trinidadians and was being paid money by them, are further concrete indicia that Mr. Suchit's admissions to the FBI were voluntarily made by him.

<u>The March 1, 2006 Statement to Trinidadian Officials</u>

In his Motion, Mr. Suchit claims that in March of 2006, he was brought to a Police Station in Trinidad and he was "asked make a second Statutory Declaration before a Justice of the Peace.  In this statement, he made certain changes to the earlier statements." [Motion, page 12]

**Contra:**    The Motion fails to identify the specific rationale for the relief it requests with regard to this statement.  The Motion does not specifically aver that Mr. Suchit was in custody at the time he gave this statement, nor that he was coerced, threatened, or intimidated by the Trinidadian authorities into making it.  Moreover, the Motion overlooks the fact that the two-page handwritten statement Mr. Suchit provided and signed on March 1, 2006 at the Arouca

-12-

Police Station [Exhibit 10] was, on March 3, 2006, re-affirmed by him in front of a Justice of the Peace in East St. George, Trinidad. [*See* Exhibit 13]  As with his January 9, 2006 Statutory Declaration to another Justice of the Peace, on March 3, 2006, Mr. Suchit declared, among other things, "[t]hat no promises or threats were made to me, nor any force used to me to induce me in any way to give the said statement which I have signed" [id., ¶ 3], and "I have made this statement voluntarily and on my own free will." [Id., ¶ 4][3]

The June 28, 2006 *Miranda-ized* Statement to the FBI

The Motion claims that, after Mr. Suchit made his various earlier statements and did what he was told, "he was assured he as to be merely a witness, not a defendant." [Motion, page 12] According to his Motion, at no time, prior to his arrest, was Mr. Suchit informed he had any criminal exposure.[4] [Id.]  After he was arrested in April of 2006 (on the Provisional Arrest Warrant from the United States), Mr. Suchit's Motion claims, he was beaten up by other (Trinidadian) inmates and he was threatened by his co-defendants there. [Motion, page 12]   Mr. Suchit claims he feared his co-defendants in Trinidad would kill him. [Motion, pages 12-13] According to Mr. Suchit's Motion, at that point, Trinidadian Homicide Constable Lucas "promised Suchit he would receive the same deal in the United States that he had gotten in Trinidad." [Motion, page 13]  Thereafter, his Motion says:

> Faced with that imminent threat and believing representations of the T/T police,

---

[3]  The Government notes that these admissions before the Justice of the Peace were mad after Mr. Suchit was obtaining Witness Protection money from the Trinidadians. [*See* Exhibits 11 & 12]

[4]  This claim is curious, in light of Mr. Suchit's earlier allegations that, on October 3, 2005, he was threatened by the Trinidadians with being charged with the Maharaj kidnapping. [*See* Motion, page 7]

-13-

Suchit waived extradition and never returned to the jail in his country.  Rather, he was turned over to the FBI and flown to the United States.  He reportedly waived his rights and continued to have conversations with the FBI agent.  During his last statement on June 28, 2006, Suchit discussed the threats made against him and all of his security concerns.  Believing he was now going to become a witness here too with the arrangements he had in T/T, Suchit continued to talk to the FBI.  [Citation omitted]  Suchit was mistaken.

    * * * * His naivete, lack of knowledge about the American system, minimal education and life skills have led him to the defenseless place in which he finds himself, arguably overborne by the T/T officials and left to fend for himself now that his usefulness in T/T has been expended.

[Motion, page 13]

    **Contra:**  Once again, Mr. Suchit's Motion fails to specifically identify a legal basis for the relief it seeks.  Even if Mr. Suchit had been in the United States, which he was not, at no time prior to his arrest in April of 2006 (as a result of the Provisional Arrest Warrant from the United States) was Mr. Suchit "in custody" for the purposes of *Miranda* analysis.  The Motion does not claim that Mr. Suchit was interrogated *by anyone* from the time of his arrest until June 28, 2006, which was the date on which Mr. Suchit was transported by the FBI from Trinidad to the United States.  The fact that Mr. Suchit *wanted* to speak with the law enforcement authorities (to gain financial rewards and seek their aid in avoiding unpleasant interactions with his co-conspirators) and *hoped* he would not be charged,[5] cannot support his claim.  Rather, they undermine it.  This is so, because they are powerful factual indicia that ***all*** his statements to *all* of the law enforcement authorities were voluntarily made by him.  This conclusion is further supported by Mr. Suchit's waiver of his *Miranda* rights following his April 2006 arrest on the Provisional Arrest Warrant from the United States.  On June 28, 2006, ***prior to*** his interrogation by the FBI,

_____

    [5]  Mr. Suchit does not claim, nor could he, that he was ever granted immunity from prosecution (nor "use immunity") by any sovereign.

Mr. Suchit waived his *Miranda* rights [*see* Exhibit 16 (Advice of Rights); & Exhibit 16-A (FBI-302), pages 1-3 (providing time line of events)], which included, *inter alia*, his right to remain silent and the warning that **anything he said could be used against him in court**. [*See* Exhibit16-A] *Oregon v. Elstad*, 470 U.S. 298, 314 & 318 (1985) (court should look at entire course of conduct; defendant's statement following *Miranda* warnings is "highly probative" of voluntariness).

## MR. SUCHIT'S MOTION IS WITHOUT MERIT AND SHOULD BE DENIED

In his Motion, Mr. Suchit suggests various claims related to the "joint venture" doctrine and the reach and application of *Miranda* in this extra-territorial case.   As shown below, Mr. Suchit's Motion fail to implicate, much less satisfy, the pre-requisites for the Joint Venture doctrine, and his *Miranda* claims are misguided, as well.

### *The Scope of the Joint Venture Doctrine*

The precise contours of the "joint venture" doctrine have not been clearly defined.  *See United States v. Yousef*, 327 F.3d 56, 146 (2d Cir. 2005).  Indeed, the courts have not devised a uniform test for determining the point at which the involvement of United States officials in an overseas interrogation turns into a joint venture.  A review of the case law indicates that it is a fact-specific inquiry, with no one factor being determinative.  *See, e.g.,*; *United States v. Emery*, 591 F.2d 1266, 1267 (9th Cir. 1978) (holding joint venture doctrine applied where DEA agent coordinated foreign arrest and was present during questioning by foreign police); *United States v. Morrow*, 537 F.2d 120, 140-41 (5th Cir. 1976) (finding no joint venture where United States officers merely furnish information to foreign officials); *United States v. Nagelberg*, 434 F.2d 585, 587 n.1 (2d Cir. 1970) (*Miranda* rule has no application where arrest and interrogation

focused upon violations of Canadian law despite presence of United States law enforcement officer); *Stonehill v. United States*, 405 F.2d 738, 746 (9th Cir. 1968), *cert. denied*, 395 U.S. 960 (1969) (finding no joint venture when United States officials offered information to Philippine officials and had knowledge of raid conducted by Philippine officials); *United States v. Abu Ali*, 395 F. Supp.2d 338, 381-82 (E.D. Va. 2005) (finding no joint venture between United States and Saudi officials because of a lack of "substantial" United States involvement in the interrogation of the defendant); *and cf.*, *United States v. Peterson*, 812 F.2d 486, 488-89 (9th Cir. 1987) (Kennedy, J.) (concluding that a Philippines wiretapping operation with "substantial" United States involvement was a joint venture, but finding no Fourth Amendment violation because the search met the Fourth Amendment's reasonableness requirement); *United States v. Marzano,* 537 F.2d 257, 269-70 (7th Cir. 1976) (finding no joint venture where United States law enforcement officers were merely present at the scene of a search and seizure); *Birdsell v. United States*, 346 F.2d 775, 782 (5th Cir. 1965) (holding although United States officers were "present and cooperating in some degree" with local officials, there was no joint venture sufficient to invoke the protections of the Fourth Amendment).

The Court's rationale in *United States v. Abu Ali*, 395 F. Supp.2d 338 (E.D. Va. 2005)*,* is persuasive:

> The evidence is that the Saudi government arrested Mr. Abu Ali in connection with the Riyadh bombing investigation. Mr. Abu Ali was detained pursuant to a Saudi government order. The Saudi government was in complete control of Mr. Abu Ali while in custody. Most importantly, the Saudi government controlled every aspect of the questioning of Mr. Abu Ali on June 15, 2003, and otherwise. The FBI and Secret Service were permitted to submit a list of questions for the interrogation to the Brigadier General and the Captain. The FBI and Secret Service were not allowed to determine the content or the form of the questions to be asked during the interrogation. The Brigadier General determined what

-16-

questions would be asked, determined the form of the questions, and set the length of the interrogation. The Saudi government refused to honor a request to allow the FBI and Secret Service to directly interview Mr. Abu Ali, and the FBI and the Secret Service did not directly question Mr. Abu Ali.

In the end, the June 15, 2003, interrogation was observed through a one-way mirror by FBI and Secret Service agents. The Court thinks both sides may agree that perhaps six questions submitted by the FBI and Secret Service were modified and used by the Brigadier General and the Captain during the session. That said, the evidence demonstrates that the Saudis were, at all times, in control of the interrogation and that the FBI never "substantially participated" in the interrogation. The only direct interrogation of the defendant conducted by U.S. officials was done by the FBI and the Secret Service in September, 2003. And while *Miranda* warnings were not given during that interrogation, the government has indicated that it does not seek to use any statements obtained during that interrogation in its case-in-chief.

The Arresting Officer acknowledged, and the Court acknowledges, that *the governments of Saudi Arabia and the United States, including the FBI, cooperate with each other in foreign terrorist investigations. The U.S. and Saudi governments share intelligence information, conduct investigations of terrorist acts, and from time to time, the Saudi government will return individuals detained in Saudi Arabia to the United States.*

The quality of the evidence at this hearing does not show a "joint venture" to arrest and detain Mr. Abu Ali. The quality of the evidence produced at this hearing *does not show that the United States was substantially involved in Mr. Abu Ali's detention or interrogation or that it used the Saudi government as a surrogate to circumvent Mr. Abu Ali's Fifth or Sixth Amendment rights.* The cooperation between Saudi and United States law enforcement and security agencies includes sharing information and periodically rendering suspects or individuals indicted in the United States and is well known.

395 F. Supp.2d at 382-83 (emphasis provided).

<u>There Was No "Joint Venture" Between the Trinidadians and the United States</u>

As is readily confirmed, Mr. Suchit's Motion does <u>not</u> claim, much less prove, that the

FBI was present at, or participated in, the interviews he provided to the Trinidadian authorities.

Thus, the Joint Venture doctrine has no application to Mr. Suchit's statements of January 8, 2006

and March 1, 2006 to the Trinidadian authorities. Nor does Mr. Suchit's Motion allege the FBI

participated in, or was even aware of, the supposed mistreatment he (falsely) claims was visited

on him by the Trinidadian authorities prior to his interview on October 4, 2005 by the FBI at the

United States Embassy in Trinidad. Therefore, the Joint Venture doctrine is not implicated in

Mr. Suchit's October 4, 2005 statement to the FBI. With regard to Mr. Suchit's January 17, 2006

statement to the FBI, Mr. Suchit's Motion does not allege he was coerced by the FBI or the

Trinidadian authorities. As a result, the Joint Venture doctrine is neither implicated nor relevant.

Finally, as established above, Mr. Suchit waived his *Miranda* rights prior to his June 28, 2006

statement to the FBI, and he does not claim he was coerced or mistreated by them. Hence, the

Joint Venture doctrine cannot apply.

Because Mr. Suchit's Motion fails to provide any basis upon which the Joint Venture

doctrine can have legitimate application, Mr. Suchit's citation to the Joint Venture doctrine is

without merit.

### *Extraterritorial Applicability of the Fifth Amendment to Foreign Interrogations*

In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Supreme Court

distinguished the Fourth Amendment right against unreasonable searches and seizures from the

Fifth Amendment right against self-incrimination on the ground that the latter is a *trial right*.[6]

That distinction was reaffirmed recently by the Supreme Court in *Chavez v. Martinez*, 538 U.S.

760 (2002) (plurality opinion), which held that it is not the failure to give *Miranda* warnings that

---

[6] As the Court made clear in *Miranda*, a suspect must "be warned that he has a right to remain silent, that any statements he does make may be used as evidence against him, and that he has a right to the presence of an attorney" during custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

violates a suspect's Fifth Amendment rights, but rather the use at trial of any "unwarned" statements which violates that suspect's rights. *Accord United States v. Patane*, 542 U.S. 630, 631 (2004) ("[P]olice do not violate a suspect's rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial."). This "trial right" distinction, as interpreted by the Supreme Court, also mandates that the protections of the Fifth Amendment, unlike those of the Fourth Amendment, be extended to nonresident aliens tried in the United States. *Verdugo*, 494 U.S. at 264 ("[t]he privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental *trial right of criminal defendants*") (*citing Malloy v. Hogan*, 378 U.S. 1 (1964) (emphasis added)). The *Verdugo* Court noted that "[the Fourth Amendment], by contrast with the Fifth and Sixth Amendments, extends its reach only to 'the people.'" and thus "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." Id. at 265.[7] The Court stated that the Fifth Amendment's use of the word "person," in contrast to the narrow usage of "the people" in the Fourth Amendment, reveals that unlike the Fourth Amendment, which is restricted to United States nationals, the Fifth Amendment will protect any person the United States has committed to prosecuting, regardless of his or her nationality. Id. at 264; *see also United States v. Gouveia*,

---

[7] Key portions of the *Verdugo* court's analysis focused on the wording of the Fourth, Fifth and Sixth Amendments, particularly the use of the word "people"in the Fourth Amendment as distinct from the use of the word "person" in the Fifth and Sixth Amendments. 494 U.S. at 265. The Court drew a distinction between the right to be free of intrusive searches and seizures, actions "fully accomplished" prior to trial, and the privilege against self-incrimination, a violation of which can occur "only at trial." Id. at 264.

467 U.S. 180, 187-89 (1984) (holding that constitutional protections incident to a fair trial attach

when the government commits to prosecute).

The holding and rationale of *Verdugo* were followed in *United States v. Bin Laden*, 132

F.Supp.2d 168 (S.D.N.Y. 2001), where the District Court reaffirmed that Fifth Amendment

protections "seemingly apply with equal vigor to all defendants facing criminal prosecution at the

hands of the United States, and without apparent regard to citizenship or community connection."

132 F. Supp.2d at183; *cf. Reid v. Covert*, 354 U.S. 1, 5-6 (1957) (holding that United States

citizens stationed abroad could invoke the protection of the Fifth and Sixth Amendments).

### *Miranda and Overseas Interrogations*

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), custodial interrogation automatically

triggers numerous procedural safeguards to protect an individual's Fifth Amendment right against

compulsory self-incrimination.  As explained in *Miranda*, custodial interrogation refers to

"questioning initiated by law enforcement officers after a person has been taken into custody or

otherwise deprived of his freedom of action in any significant way."  384 U.S. at 444.  The Court

has stressed that these safeguards come into play *only* when the defendant is subject to *both*

custody and interrogation.  *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980); *Beckwith v. United*

*States*, 425 U.S. 341, 347 (1975).

With regard to the scope of the extra-territorial application of *Miranda*,[8] the *Bin Laden*

---

[8]  It is well-established that the Sixth Amendment right to counsel "does not attach until a
prosecution is commenced, that is, at or after the initiation of adversary judicial criminal
proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or
arraignment." *Texas v. Cobb*, 532 U.S. 162, 166 (2001) *(quoting McNeil v. Wisconsin*, 501 U.S.
171, 175 (1991)).  Accordingly, "if police initiate interrogation after a defendant's assertion, at an
arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to
counsel for that police-initiated interrogation is invalid." *Michigan v. Jackson*, 475 U.S. 625,

Court suggested that FBI agents should make inquiry into a specific Nation's law regarding what *Miranda*-type rights are available to the suspect, and speak to local authorities to determine whether they will allow the suspect to consult with an attorney. 132 F. Supp.2d at 192 n.23. However, the Court observed, even *Miranda* "does not require law enforcement agents to promise that which they cannot guarantee or that which is in fact impossible to fulfill." Id. at 188. "The goal is to convey to a suspect [overseas] that, with respect to any questioning by United States agents, his ability to exercise his right to the presence and assistance of counsel ... hinges on two external considerations arising from the fact of his foreign custody." Id. These two factors are: (1) "the availability of public counsel overseas turns chiefly on foreign law;" and (2) "foreign law may also ban all manner of defense counsel from even entering the foreign stationhouse, and such law necessarily trumps American procedure." Id.

Before a statement resulting from a custodial interrogation will be admitted in evidence in a prosecution in the United States, the Government must also show that a statement was made voluntarily. *Malloy v. Hogan*, 378 U.S. 1 (1964). However, it is unclear whether the Constitution requires suppression of involuntary statements that are the product of coercion solely at the hands of foreign authorities. In *Bram v. United States*, 168 U.S. 532, 565 (1897), the Supreme Court held that a statement coerced by foreign authorities "was wrongfully admitted" under the Fifth Amendment. However, *Bram* did not specifically consider whether coercion by a foreign actor would affect constitutional analysis. To be sure, in practice, some

─────────────────────────

636 (1986). However, it is generally held that there is no constitutional infirmity for a <u>federal</u> law enforcement agent to interview a defendant against whom <u>state</u> charges are pending. *See, e.g., United States v. Avants*, 278 F.3d 510, 515-18 (5th Cir. 2002). By analogy, this same principle should apply in the international context. *Cf.*, *United States v. Rashed*, 234 F.3d 1280, 1281 (D.C. Cir. 2000); *United States v. Liddy*, 542 F.2d 76, 79 (D.C. Cir. 1976).

courts effectively admit only voluntary statements, *see United States v. Yousef*, 327 F.3d 56, 146 (2nd Cir.), *cert. denied*, 540 U.S. 933 (2003); *United States v. Welch*, 455 F.3d 211, 213 (2d Cir. 1972) ("Whenever a court is asked to rule upon the admissibility of a statement made to a foreign police officer, the court must consider the totality of the circumstances to determine whether the statement was voluntary"), some Courts have questioned whether statements coerced by foreign authorities might nonetheless be admissible, *see United States v. Wolf*, 813 F.2d 970, 973 n.3 (9th Cir. 1987) (suggesting that, under *Colorado v. Connely*, 479 U.S. 157 (1986), suppression is not required when statement is obtained by coercion of foreign police, but not deciding the issue), while other Courts suggest that involuntary statements are inadmissible only if the conduct "shocks the conscience." *United States v. Yousef*, 327 F.3d at 146; *cf. United States v. Mitro*, 880 F.2d 1480, 1483 (1st Cir. 1989) (stating, in the context of foreign wiretap evidence, "only conduct on the part of foreign police that shocks the judicial conscience could warrant suppression of foreign-seized evidence").

In this Circuit, there is no guiding precedent as to whether the Court's inquiry should be formulated in terms of "voluntariness" or "shock the conscience." *See United States v. Karake*, 443 F.Supp.2d 8, 52 (D.D.C. 2006) (Huvelle, J.) Fortunately, this weighty debate need not be resolved here. This is so, because, as established above, each of the statements of which Mr. Suchit complains was, in fact, voluntarily made by him. As a result, all of his statements will be admissible at trial, irrespective of which test is applied.

### *Subsequent Statements: "Cat-Out-of-the-Bag"*

Mr. Suchit's Motion suggests that all of his statements should be suppressed because one or more of his earlier statements were allegedly coerced by the Trinidadians. As set forth above,

Mr. Suchit's claim of coercion by the Trinidadian authorities is without merit.   Moreover, even

if there was some substance to his claims, which there is not, Mr. Suchit's uncoerced statements

would be admissible, in any event.

The leading case in the area is of subsequent post-rights statements is <u>Oregon v. Elstad</u>,

470 U.S. 298 (1985).  In *Elstad*, an 18 year old defendant was arrested at his home for First

Degree Burglary and made a pre-*Miranda* incriminating statement.  <u>Id</u>. at 301.  Thereafter,

defendant was taken to the Police Station, where he was provided *Miranda* warnings, which he

knowingly and voluntarily waived, before he provided a written confession.  <u>Id</u>. at 301-02.  In the

subsequent prosecution of the defendant, the initial (pre-rights) incriminating statement was

suppressed, but the subsequent (post-rights) written confession was admitted, and the defendant

was convicted.  <u>Id</u>. at 302.  On appeal, defendant argued, *inter alia*, his written confession was

improperly admitted at trial, because it was tainted ("cat-out-of-the-bag") by the earlier

inculpatory statement.  <u>Id</u>. at 303.  The Oregon Court of Appeals reversed defendant's

conviction, reasoning that the brief period of time separating the two statements created a

coercive effect on the second statement.  <u>Id</u>.  The Oregon Supreme Court denied review. <u>Id</u>.  On

Petition for Certiorari, the Supreme Court reversed and remanded.  <u>Id</u>.. at 318.

In so doing, the Supreme Court observed:

> We must conclude that, absent deliberately coercive or improper tactics in
> obtaining the initial statement, the mere fact that a suspect has made an
> unwarned admission does not warrant a presumption of compulsion.  A
> subsequent administration of Miranda warnings to a suspect who has given
> a voluntary but unwarned statement ordinarily will suffice to remove the
> conditions that precluded admission of the earlier statement.  In such
> circumstances, the finder of fact may reasonably conclude that the suspect
> made a rational and intelligent choice to waive or invoke his rights.

470 U.S. at 314.  In conclusion, the Court provided the following guidance:

> The relevant inquiry is whether, in fact, the second statement was ...
> voluntarily made.  As in any such inquiry, the finder of fact must examine
> the surrounding circumstances and the entire course of police conduct with
> respect to the statements.  The fact that a suspect chooses to speak after
> being informed of his rights is, or course, highly probative.

470 U.S. at 318; *and see Brown v. Illinois*, 422 U.S. 590, 603 (1975).  *See also Holland v.

McGinnis*, 963 F.2d 1044, 1050-51 (7th Cir. 1992) (assuming that the police beat the first

confession out of the defendant, a second confession made six hours later was admissible where

the defendant had been transferred to a different police station, given new Miranda warnings and

questioned by a new set of interrogators; "this is not to say that the contamination from the [first

confession] had completely disappeared, but rather that, due to the 'break in the stream of

events,' the contamination was not sufficient, by itself, to render involuntary the [second]

confession"); *United States v. Daniel*, 932 F.2d 517, 521-22 (6th Cir.1991) (even assuming that

the defendant's first statement, given while a sheet was over his head, was coerced, a second

statement was not coerced where it was given the next day, in a different location, by a different

interrogator, who carefully gave *Miranda* warnings).[9]

    In *Westover v. United States*, 384 U.S. 436 (1966), a case where a subsequent confession

did not break free of the initial taint, the Supreme Court offered guidance  in how to both avoid a

constitutional violation and honor *Miranda* rights:

> We do not suggest that law enforcement authorities are precluded from
> questioning any individual who has been held for a period of time by other
> authorities and interrogated by them without appropriate warnings.  A different
> case would be presented if an accused were taken into custody by the second

---

[9]  In the end, the test for determining the admissibility of prior confessions is whether the
suspect's will was overborne.  *See, e.g., Townsend v. Sain*, 372 U.S. 293, 307 (1963).

> authority, removed from both time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. But here the FBI interrogation was conducted immediately following the state interrogation in the same police station – in the same compelling surroundings. Thus, in obtaining a confession from Westover the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of warnings alone was not sufficient to protect the privilege.

384 U.S. at 496-97.

Here, Mr. Suchit's Motion does not contend that the FBI coerced confessions from him. Moreover, as established above, neither were Mr. Suchit's various statements to the Trinidadians the product of coercion. However, assuming *arguendo* that Mr. Suchit's statements to the Trinidadians had been coerced from him, those statements were removed in time and location from his earlier statements and they were made to a different questioner from a different sovereign. Hence, not only was Mr. Suchit not in custody at the time of his statements to the FBI (save the June 28, 2006 post-*Miranda* statement), but his statements were distinct from any residual taint arising from the earlier alleged misconduct of the Trinidadians.

As a result, Mr. Suchit's claims of taint are without merit.

Hence, as established above, Mr. Suchit voluntarily telephoned Trinidadian Crime Stoppers seeking to obtain the offered reward. Thereafter Mr. Suchit voluntarily spoke repeatedly with the victim's brother ("Nirmal") about the offenses in question. Later still, Mr. Suchit met repeatedly with Nirmal and Constable Forbes and Mr. Suchit voluntarily spoke with Constable Forbes, on numerous occasions, about the offenses in question seeking to obtain the reward money. Then, Mr. Suchit went to the United States Embassy in Trinidad and voluntarily spoke with Special Agents from the FBI, telling them what he knew, in order to advance his

claim on the reward money.  Mr. Suchit admits he voluntarily participated in a ruse for the

Trinidadians in order to assist in the arrest of his friend, Anderson Straker, and that he voluntarily

participated in another ruse for the Trinidadians following Doreen Alexander's arrest by them.

Later, he spoke again with the FBI in Trinidad, as to which statement he does not claim he was

coerced.   With regard to both of Mr. Suchit's underlying handwritten statements to the

Trinidadians, Mr. Suchit admits he later went before a Trinidadian Justice of the Peace and

executed a Statutory Declaration.  Mr. Suchit cannot deny that in his Statutory Declarations

before the Justices of the Peace, he admitted that the statements were not the result of promises,

threats, or force and that the statements were voluntarily made by him.  Finally, Mr. Suchit's

June 28, 2006 custodial statement to the FBI was voluntarily made by him after he waived his

*Miranda* rights.

       As a result, for each of the independent reasons set forth above, all of the allegations of

Mr. Suchit's Motion are without merit and should be, in all things, denied.

WHEREFORE, for each of the independent reasons set forth above, Defendant David

Suchit's Motion to Suppress Statements should be, in all things, denied.

    Respectfully submitted,

JEFFREY A. TAYLOR (D.C. Bar No. 498610)
United States Attorney


By: _____
BRUCE R. HEGYI (D.C. Bar No. 422741)
Assistant United States Attorney
Federal Major Crimes Section
555 Fourth Street, N.W., Room 4848
Washington, D.C.  20530
(202) 305-9637
(202) 353-9414 (fax)
www.bruce.hegyi@usdoj.gov


JEANNE M. HAUCH
Assistant United States Attorney
National Security Section
555 Fourth Street, N.W., 11th Floor
Washington, D.C.  20530
(202) 514-5776

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of December, 2006, a true and correct copy of the above and foregoing GOVERNMENT'S OPPOSITION TO DEFENDANT SUCHIT'S MOTION TO SUPPRESS STATEMENTS and Exhibits was served on the following by First Class Mail, postage pre-paid, upon:

>       DIANE LEPLEY, ESQUIRE
>       400 SEVENTH STREET, N.W.
>       SUITE 400
>       WASHINGTON, D.C.  20004

_____
BRUCE R. HEGYI
Assistant United States Attorney