# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Criminal No. 06-102 (05) (JDB)** |
| **DAVID SUCHIT,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

Defendant David A. Suchit, a citizen of the Republic of Trinidad and Tobago ("Trinidad"), was extradited from Trinidad to the United States in June 2006 to face charges of conspiracy to commit hostage taking resulting in death in violation of 18 U.S.C. § 1203, and aiding and abetting the alleged hostage taking. Presently before the Court is defendant's motion to return defendant to his country of origin and defendant's motion to suppress his statements to the Federal Bureau of Investigation ("FBI") and to police authorities in Trinidad. An evidentiary hearing was held on February 12 and 13, 2007.[1] For the reasons that follow, the Court will deny defendant's motions.[2]

## FACTUAL BACKGROUND AND FINDINGS

Defendant is one of twelve defendants from Trinidad facing federal criminal charges arising from the April 2005 kidnapping and subsequent death of Balram Maharaj, a U.S. citizen

---

[1] Citations to the hearing transcript ("Tr.") refer to the volume for the February 12, 2007 proceedings unless otherwise noted.

[2] Defendant also moved to dismiss the indictment on the basis of due process violations arising from his alleged inability to obtain evidence located in Trinidad. However, defendant has stipulated that the motion should be held in abeyance pending processing of letters rogatory that may result in his ability to obtain the evidence at issue. See Def.'s Omnibus Reply Br. at 2; Tr., vol. 2, at 4-5 (Feb. 13, 2007).

visiting family in Trinidad. Defendant played a key role as a cooperating witness during the investigation by Trinidad authorities and the FBI from September 2005 to March 2006, which resulted in several oral and written statements to Trinidad authorities and the FBI. These statements eventually led the United States to conclude in March 2006 that defendant should be treated as a target rather than a witness. See Tr. at 70. Thus, on April 26, 2006, the grand jury returned an indictment naming Suchit as a defendant, and he was arrested the next day in Trinidad pursuant to a provisional arrest warrant from the United States. He consented to extradition on June 26, 2006, and was flown to the United States two days later.

The resolution of the pending motions requires the Court to determine whether, on five separate occasions -- September 28, 2005, October 3 to 4, 2005, and January 8, February 17, and March 1, 2006 -- Suchit was "in custody" at the time of the statements and whether he made the statements voluntarily. Defendant also asks the Court to evaluate the voluntariness of Suchit's consent to extradition. The Court thus makes the following factual findings with respect to the circumstances surrounding Suchit's statements and extradition.

These factual findings are based on the testimony of two witnesses and the exhibits authenticated by them. The Court observes that the primary evidence submitted during the motions hearing was the testimony of FBI Special Agent William T. Clauss, the lead FBI investigator who interviewed Suchit on multiple occasions and acted as the FBI's primary liaison with the Trinidad police. He offered testimony on the scope and nature of the U.S. and Trinidad kidnapping investigations and his personal observations of the circumstances surrounding his interviews with Suchit. Clauss also interviewed Trinidad police officers and the victim's brother,

Neermal John, about Suchit, and offered hearsay evidence of their statements.[3]   The Court finds

Clauss to be a credible and forthright witness.  His testimony was consistent, he candidly

acknowledged when he lacked responsive information, and he showed no hesitation in providing

information that might create uncertainty over the probative value of his responses.   The second

witness was Brad Davidson, defense counsel's investigator.  His testimony focused almost

exclusively on the circumstances surrounding one police visit to Suchit's home in early October

2005.  Thus, the Court relies on Clauss's largely unrebutted testimony in making its factual

findings, giving due consideration to defendant's evidence regarding the police visit to his home

in early October 2005.  The Court also relies on those statements made by defendant that are not

in controversy,[4] and makes limited use of the statements that are in controversy to establish a

context for the alleged events.[5]  With this preface, the saga begins.

---

[3]  It is well-settled that hearsay evidence may be considered in resolving a motion to
suppress evidence.  United States v. Raddatz, 447 U.S. 667, 679 (1980) ("At a suppression
hearing, the court may rely on hearsay and other evidence, even though the evidence would not
be admissible at trial.") (citing United States v. Matlock, 415 U.S. 164, 172-74 (1974) and Fed.
R. Evid. 104(a)); United States v. Foster, 986 F.2d 541, 543 (D.C. Cir. 1993) (recognizing that
"hearsay is generally admissible" at suppression hearings).  Hearsay statements, like any other
evidence, should be considered in light of their trustworthiness and reliability (see Matlock, 415
U.S. at 174-75), and the Court has considered those factors here in relying upon the hearsay
statements proffered in this matter.

[4]  The statements excluded from the suppression motion are: defendant's January 26, 2006
statement (Gov't Ex. 8), an undated statement estimated to be from late January 2006 (Gov't Ex.
7), his statement on June 28, 2006, and two memoranda dated October 6 and 7, 2005, written by
Trinidad police regarding its contacts with defendant.  See Tr. at 9-11, 82-87.

[5]  More specifically, the Court has limited its reliance on the statements in controversy to
establish objective circumstances of the interviews (i.e., date and time, participants) and to
provide context for events that occurred later in the investigation (i.e., the roles of other suspects
in the kidnapping and Suchit's fear that they would retaliate).

Balram Maharaj was visiting his family in Trinidad when he was kidnapped from the Samaan Tree Bar on or about April 6, 2005. Tr. at 15, 28-29. The U.S. Embassy in Trinidad was notified of the abduction by a family member the next day. Id. at 16-17, 95-96. Within days, the FBI commenced an investigation through its Miami office, with Special Agent Clauss acting as its lead investigator.[6] Id. at 18. Clauss arrived in Trinidad on April 10, 2005 with three U.S. hostage negotiators. Id. at 96, 99. At that point, four days had passed, and the Trinidad police investigation was well underway. Id. at 96-97. The kidnappers had made a ransom demand of $3 million Trinidad dollars -- approximately $500,000 U.S. dollars. Id. at 26-27. The Trinidad antikidnapping unit had stationed officers at the residence of the victim's mother 24 hours a day -- two officers, on 12-hour shifts -- and had set up equipment to record incoming ransom calls. Id. at 97-100. When the FBI arrived, Clauss explained that they were there to assist in the investigation because the victim was a U.S. citizen and United States law thus covered the crime. Id. at 97. Clauss exercised the primary investigative authority on behalf of the United States, which included interviewing family members and potential witnesses at the crime site, whereas the hostage negotiators provided advice to the victim's family on the ransom negotiations. Id. at 100-01. The last ransom call was received on April 13, 2005, at which time the family requested that the kidnappers provide proof of life. Id. at 103-04. No further contacts from the kidnappers were received after that date. Id. They abandoned their ransom efforts when the victim died that day, although the family, Trinidad police, and the FBI, at that time, had no knowledge of his

---

[6] Within the U.S. Embassy in Trinidad, both the Department of State regional security office and an FBI temporary duty officer played an initial role in communicating news of the abduction to other FBI offices in Caracas, Venezuela and Miami. See Tr. at 17, 93-95. The FBI temporary duty officer at the Embassy, Emory Harshman, also contacted the Maharaj family to gather preliminary baseline information. Tr. at 97-98.

death or whereabouts.  Id. at 19, 29.  The case went cold after the April 13 call, and the FBI thus

left Trinidad about ten days later.  Id. at 103-04.  A few days later, around April 27, 2005, the

Trinidad police shut down the recording equipment and ended its 24-hour station at the family's

residence.  Id. at 102-03.

      The Maharaj kidnapping had been widely publicized in Trinidad, and a reward for

information about the crime had been announced by both U.S. and Trinidad authorities and

publicized by an organization known as Crimestoppers.  Tr. at 22-23; see also Gov't Ex. 18 (U.S.

press release announcing reward).  Suchit's first contact with investigators occurred at his

initiation on or about April 15, 2005, two days after Maharaj's death, when he made an

anonymous call to Crimestoppers to provide authorities with information about the kidnapping.

Id. at 19-20, 31.  On May 5, 2005, he placed four more calls to Crimestoppers to report that

Anderson Straker was involved in the kidnapping.  Id. at 19, 24-25; Gov't Ex. 17.  For reasons

that are unknown, the information was not relayed to the Trinidad antikidnapping unit or FBI

until over five months later.  Tr. at 124-25.

      The record indicates that there were no significant developments in the FBI or Trinidad

investigations until the following September of 2005.  The victim's brother, Neermal John

(referred to in the record primarily as "Neermal" and "Nimal"), had, by coincidence, moved from

his mother's residence to the town of Arima a few months after the kidnapping, living only about

400 yards away from Suchit.  Id. at 27, 129.  They had met each other a handful of times and

smoked marijuana together.  Id. at 27.  Neermal became aware that Suchit had a criminal record,

and this eventually led Neermal to request Suchit's assistance in retaliating against someone he

suspected was involved in Maharaj's kidnapping.  Id. at 29-30.  When Neermal told Suchit the

story of his brother's kidnapping, Suchit responded that he had personal knowledge about the

kidnappers and had already contacted Crimestoppers.  Id. at 30-31.  Neermal responded that the United States had offered a $10,000 reward for information on the kidnapping, and asked Suchit to meet with Constable Phillip Forbes, the lead investigator from the Trinidad police antikidnapping unit.  Id. at 31, 36.  Suchit agreed to do so.  Id. at 31.

The initial meeting, arranged by Neermal, took place on or about September 28, 2005 at Neermal's residence, with Neermal, Suchit, Forbes and another Trinidad police officer participating.  Id. at 31-34, 79-80.  A second meeting between Suchit and Forbes took place a few days later at Suchit's residence.[7]  Id. at 33-34, 80. Forbes did not threaten or otherwise intimidate Suchit at these meetings.  Id. at 34-35.

In the first few days of October 2005, arrangements were being made to have the FBI interview Suchit at the U.S. Embassy on or about October 4.  Id. at 34-35.  Constable Forbes had at that time informed Special Agent Clauss that an informant (Suchit) had come forward with information about the kidnapping -- the first significant lead for the FBI since they had left Trinidad in April.  Id. at 35-36, 108, 115-17.  Clauss traveled from Miami to Trinidad on short notice in order to conduct the interview, with the understanding that the interview would take place whenever he arrived on October 4.  Id. at 117-19.  Suchit discussed the anticipated FBI interview with Neermal beforehand, expressing some degree of excitement about the opportunity to provide information to the FBI.  Id. at 35.

Two police officers transported Suchit from his residence to his interview with the FBI. At that time, Suchit lived with his wife, Leera Suchit; his mother, Soogan Suchit; and one of his brothers, Tony Suchit.  Def.'s Ex. 1 (Statement of Soogan Suchit); Def.'s Ex. 3 (Statement of

---

[7] Information gained from the meetings was summarized in memoranda by Forbes dated September 28, October 6, and October 7, 2005. See Gov't Ex. 1, 3, 4; Tr. at 33, 43-44.

Leera Suchit); Def.'s Ex. 5 (Statement of Tony Suchit); see also Def.'s Ex. 2 (Statement of Wayne

Suchit) (second brother living in the area); Def.'s Ex. 4 (Statement of Antonio Pollard)

(houseguest at the Suchit residence on date of police arrival).  When the officers arrived, they

came in an unmarked car and were not in uniform, but did have their guns with them.  Soogan

Suchit Stmt. at 1; Leera Suchit Stmt. at 1-2; Tony Suchit Stmt. at 1.  They told Soogan Suchit

and defendant himself that they needed to question him about a kidnapping.  Soogan Suchit Stmt.

at 1-2; Leera Suchit Stmt. at 2; Tony Suchit Stmt. at 1.  They further told defendant he should put

on some clothes because they were going to the Arouca police station in Trinidad.  Tony Suchit

Stmt. at 2.  Defendant did so and returned to the officers, who then handcuffed him and led him

to the back seat of the car.  Soogan Suchit Stmt. at 2; Leera Suchit Stmt. at 2; Tony Suchit Stmt.

at 2.  The officers drove him to the Arouca station, where he apparently stayed overnight.[8]  See

Leera Suchit Stmt. at 4-5.

     Defendant's wife and one of his brothers searched for defendant that evening with limited

success.  Leera Suchit Stmt. at 3-4; Wayne Suchit Stmt. at 2-3.  The night of October 3, they

telephoned and visited three police stations, including the Arouca police station, and initially

received no information as to defendant's whereabouts.  Leera Suchit Stmt. at 3; Wayne Suchit

---

[8]  The government suggests that the weight of the evidence indicates that Suchit did not
stay overnight at the Arouca police station prior to the FBI interview on October 4 -- that is, the
police pick-up and interview occurred on the same day.  Tr. at 68-69.  That is one plausible
reading of the evidence, in light of Clauss's testimony -- based on his interviews of Suchit and
Neermal -- that Suchit had face-to-face conversations with Neermal and Straker on October 3.
However, the Court finds that the hearsay statements of Leera and Wayne Suchit are more
probative on the issue of Suchit's whereabouts on October 3 in light of the detailed and consistent
description of events provided by them, in contrast to the generalized conclusory statements
recounted by Clauss.  The fact that defense counsel's investigator conducted the interviews and
recorded their statements (Tr. at 187-89) is not sufficient to discredit the statements.  Based on
the investigator's testimony, the Court is satisfied that he made good faith and reasonable efforts
not to influence the content of the statements.  The use of an investigator to obtain the statements
from family members in Trinidad was reasonable and necessary under the circumstances.

Stmt. at 2. Leera Suchit then returned to the Arouca station to make further inquiries and was told by an officer that Suchit was there for questioning about a kidnapping and would be released the next day. Leera Suchit Stmt. at 3-4.

Clauss arrived the next afternoon, October 4, 2005, and promptly called Forbes so that the interview could be done that day. Constables Forbes and Brebnor drove Suchit to the U.S. Embassy, arriving at about 5:00 p.m. Tr. at 37, 143. Clauss conducted the interview in the presence of Forbes and the FBI assistant legal attache at the Embassy.[9] Id. at 119; Gov't Ex. 2, at 1.

The interview lasted four to five hours, until 9:00 or 10:00 p.m. Tr. at 39; Gov't Ex. 2. Among other things, Suchit described himself as having a minor role in the kidnapping -- that is, driving Anderson Straker to make telephone calls while the victim was being held hostage and acting as Straker's messenger to a co-conspirator named Doreen when the victim died. Tr. at 19; Gov't Ex. 2. Suchit's demeanor was calm and relaxed, and he appeared eager to provide information to the FBI. Tr. at 19. Clauss did not place Suchit under arrest, or otherwise place restrictions on Suchit's ability to leave. Id. at 39. Clauss saw no indicia that Forbes had placed any restrictions on Suchit's liberty. Id. at 38. As to Suchit's relationship with Forbes, Clauss did not observe any indicia of fear, trepidation, anxiety or reserve. Id. The only fear that Suchit expressed was that his cooperation with the local police and FBI put him at risk of harm from the other alleged kidnappers; he thus requested that his identity be kept confidential. Id. at 38-39. After the interview was done, the Trinidad police drove Suchit back to his residence in Arima. See Leera Suchit Stmt. at 5. When Suchit returned home, he made no mention to his family of mistreatment by the police. Id. at 201-02. Clauss's summary of the interview is set forth in an

---

[9] Constable Brebnor remained outside the Embassy during the interview. Tr. at 143.

FBI Form 302.  See Tr. at 41-42; Gov't Ex. 2. Consistent with Suchit's request for confidentiality,

he placed the header "PROTECT IDENTITY" at the top of each page.  Gov't Ex. 2.

After the October 4th interview, the pace of the FBI investigation slowed again.  Tr. at 40.

In November 2005, Detective Corporal Wendell Lucas from the Trinidad homicide bureau

advised Clauss that the case would be transferred from the antikidnapping unit to his bureau

because the duration of time that had passed with no information suggested that the victim was

dead -- a conclusion consistent with the information provided by Suchit.  Id. at 41.  Around that

time, Clauss also learned that Lucas had been getting independent information from another

informant.  Id. at 108-09.  That information soon began to "triangulate" with information that

Suchit had provided.  Id. at 40.

In January 2006, major strides in the investigation took place.  Clauss flew back to

Trinidad on January 3, 2006 to conduct follow-up investigation, touch base with the Trinidad

investigators, and conduct further liaison to find out what else could take place to further the

investigation.  Id. at 44-45.  Upon his arrival, he learned that the Trinidad police planned to arrest

two suspects the next day, co-defendants Zion Clarke and Kevon Demerieux.  Id. at 45.  Those

arrests took place as planned on January 4.  Id.

The police also planned to arrest the woman name Doreen whom Suchit had described

earlier -- Doreen Alexander -- and they relied on Suchit to make the necessary identification in

support of the arrest.  Id. at 45-47.  To this end, Suchit arrived at the police station, uncuffed, on

January 5, 2006 in an unmarked car with two police officers.[10]  Id. at 46.  To ensure that Suchit

would not be implicated as an informant, however, the officers devised a "ruse" to make it appear

---

[10]  Clauss personally observed Suchit's involvement in Doreen's arrest while he was at the Arouca police station on January 5, 2006.  Tr. at 45.

that Suchit was at the police station as an arrestee.  Id.   They thus placed Suchit in handcuffs before entering the station, and then walked Suchit into the homicide office, past a cubicle where Doreen was seated.  Id. at 46-47.  As he walked by, he made comments to the effect of "that's Doreen, that's the woman," which, from the context, indicates he identified Doreen as the woman he referred to in his earlier statements to the Trinidad police and FBI.  Id. at 47.  The police then placed Suchit against the wall so that a photograph could be taken of him, as if it were an arrest photo, and next led him outside of the homicide office, where the handcuffs were removed.  Id. He exited the building, but stayed in the parking lot for another 20 to 30 minutes smoking a cigarette and conversing with the officers while he waited for a police officer to become available to give him a ride home.  Id. at 47-48.

While in the parking lot, the police told Suchit they were having difficulty locating Straker, who had several residences.  Id. at 48.  Suchit then offered to call Straker and create a story that would cause Straker to disclose his whereabouts.  Id.  That evening, January 5, Suchit placed the call to Straker, and told him that he needed to use Straker's van to move tires.  Id. at 48-49.  Straker responded that he could not help because he was at his home in the town of Mayaro, which was too far away from Suchit's area.  Id. at 49.  Suchit was given a ride home that evening.  Id. at 48.  Early the next morning, Straker was arrested in Mayaro.  Id. at 51.

Suchit returned to the station on January 8 to make a comprehensive statement about the kidnapping to the Trinidad police.[11]  Id. at 52-53.  His statement was delayed, however, by another aspect of the investigation -- the search for Maharaj's remains in a forest near Santa Cruz,

---

[11]  Clauss was not present for the January 8 statement, but interviewed Constable Gosyne about the specific circumstances surrounding the statement. Tr. at 53.

taking place that same day.[12]  Id.  Thus, Suchit was apparently left waiting for several hours, until

about 3:15 p.m.  Id. at 52; Gov't Ex. 5 at 12 (indicating time of interview).  During that time, he

watched television and made inquiries to Constable Gosyne as to the status of the search for

Maharaj's remains.  Tr. at 54-55.  When the field officers reported that the remains had been

found, Suchit expressed some degree of excitement.  Id.  That afternoon, over a period of about

three hours, he made an oral statement describing the events surrounding the kidnapping, which

was recorded by Constable Gosyne and reviewed and signed by Suchit.[13]  See Gov't Ex. 5

(handwritten statement); Def. Ex. E (same); see also Def. Ex. D (typed version of the same

statement).  The next day, he signed a "statutory declaration" form before a Trinidad Justice of

the Peace that, like a declaration in federal court here, attests to the statement's truthfulness and

accuracy, and represents that it was voluntarily made.  See Gov't Ex. 6.

　　　The investigation continued to make advances in the ensuing weeks.  Russell Jerry Joseph

turned himself into Trinidad police on January 17, 2006.  Tr. at 59.  Five days later, Jason Errol

Percival came forward with information and was admitted into the Trinidad Witness Protection

Programme.  Id.  On January 27, six more arrests were made: Ricardo Stevenson, Ricardo De

Four, Leon Nurse, Wayne Pierre, Kenneth Pierre, and Kevin Nixon.  Id. at 62-63.  Around that

time, Suchit told the Homicide Bureau that he wished to be admitted to the Witness Protection

---

　　　[12]  Police had obtained information regarding the location of the body from defendant
Zion Clarke.  Tr. at 51-52.  The Court makes no judgment at this time as to the admissibility of
those statements against Clarke, should he ultimately stand trial in the United States.

　　　[13]  Constable Gosyne's certification at the end of the document states: "I hereby certified
having recorded this statement from DAVID SUCHIT . . . during the period 3:15 p.m. and 6:00
p.m. on Sunday, 8th January, 2005 [sic].  He read it over aloud, said that it was correct and
signed each sheet of paper and put date."  See Gov't Ex. 5 at 12.  Defendant does not presently
contest the accuracy of Gosyne's transcription, and the Court sees no reason to address that issue
on the present record.

Programme because he feared for his safety and the safety of his wife and children.  <u>See</u> Gov't Ex. 7. He explained that strangers had come by his house asking for him and that the arrestees must have concluded that he was an informant.  <u>Id.</u>  He also provided basic information about his criminal history, apparently to enable his fitness for the program to be evaluated.[14]  <u>Id.</u>; <u>see</u> <u>also</u> Gov't Ex. 8 (statement dated January 26, 2007).  He stated that he believed he and his family would be "safe" at a relative's house, but sought other protections the program offered, apparently referring to subsistence funding.  <u>See</u> Gov't Ex. 7. The Trinidad police prepared risk and threat assessments dated January 27, 2006 as part of its evaluation of whether protection was needed and appropriate for Suchit.  <u>See</u> Gov't Ex. 8A, 8-B (acknowledging potential threats from associates of Anderson Straker, without quantifying the threat).

Clauss also was aware of Suchit's concerns about his safety, and scheduled an interview for February 17, 2006 in response to those concerns and also to clarify information from Suchit's October 2005 statement.  <u>Id.</u> at 64-65.  By the time of the interview, Suchit had already moved to the relative's house, but safety remained a concern for him.  <u>Id.</u> at 138-39.  Clauss conducted the interview at the Arouca police station, but under conditions that were nonrestrictive.  <u>Id.</u> at 64-65. Suchit was not handcuffed, nor was his freedom of movement restricted in any manner.  <u>Id.</u> Although another FBI agent and Trinidad police were present in the office at the time of the interview, Suchit did not express any concern about their presence.  <u>Id.</u> at 65.  Clauss

---

[14]  The statement is undated, but the Court infers from the references to the January arrests and the threat assessment conducted by the Trinidad police on January 27, 2006, that the statement was likely made in late January 2006.

summarized Suchit's statement in another FBI Form 302, again using the header "PROTECT IDENTITY" on each page.[15]  See Gov't Ex. 9.

By March 1, 2006, Suchit had been offered the full Witness Protection Programme by the Trinidad police, and had begun receiving subsistence payments under that program at a rate of about $3,800 Trinidad dollars per month.  See Tr. at 138-39; Gov't Ex. 11-12, 14-15 (receipts for March 1 and April 4 payments for groceries and subsistence).  He declined their offer of relocation, however, because he had decided he would be safe at his relative's residence.  Tr. at 138-39.  On the day he received his first subsistence payment, March 1, Suchit had another interview at the Arouca police station, this time with Constable Gosyne.[16]  Id. at 65-66.  She had requested an additional statement from Suchit to clarify aspects of his January 8, 2006 statement to her.  Id.  As before, Gosyne recorded Suchit's oral statement by hand, and then had him review the document for its accuracy before signing it.  See Gov't Ex. 10, at 2.  Over the course of the 45 minute interview, Suchit appeared normal and relaxed.  Tr. at 66; Gov't Ex. 10, at 2 (stating that interview ran from 8:05 a.m. to 8:45 a.m.).  He signed the standard "statutory declaration" form on March 3 before a Trinidad Justice of the Peace, attesting to the statement's truthfulness and accuracy, and representing that it had been voluntarily made.  See Gov't Ex. 13.

Even as Suchit continued to receive witness protection payments in Trinidad, the United States investigation concerning Suchit began to take a different course.  In March 2006, the U.S. Attorney's Office in the District of Columbia made a decision to prosecute Suchit, no longer

---

[15]  Clauss noted one error in the statement -- the reference in the first paragraph to January 17, 2006 as the interview date was in error, and should refer to February 17.  Tr. at 64; see Gov't Ex. 9 at 1.

[16]  Clauss was not present for the March 1 statement, but interviewed Constable Gosyne about the specific circumstances surrounding the statement.  Tr. at 66.

regarding him as simply a witness. Tr. at 70.   The grand jury returned an indictment on April 26,

2006 naming Suchit as a defendant, and he was arrested by Trinidad police the next day pursuant

to a provisional arrest warrant from the United States.  Id. at 90.

Suchit appeared before the Chief Magistrate in Trinidad on April 27, along with four

other suspects.[17]  See Def.'s Motion for Return to Country of Origin at 2.  The charges from the

indictment were read to him in open court, but he did not immediately consent to extradition.  Id.

Suchit consented to the extradition two months later, on June 26, 2006.  Id. at 3.  Clauss and

another FBI special agent received custody of Suchit from the Interpol Office in Trinidad on June

28, on which date he was flown from Trinidad to the United States.  Gov't Ex. 16 (FBI Form 302,

summarizing Suchit's interview with Clauss on June 28, 2006).  Suchit signed a written waiver of

his Miranda rights and agreed to speak to the agents -- a waiver that is uncontested here.  Id.; see

also Ex. 16-A.  At that time, Suchit stated that he would have consented to the extradition much

earlier, but was scared to do so in front of the other arrestees.  Gov't Ex. 16 at 3.  Suchit informed

the FBI that some of his co-defendants had become aware of his status as an informant, and

Straker and Stevenson had threatened to kill him and his family if he consented to extradition.

Id.  Nonetheless, he hoped to continue cooperating with the investigation in the United States.

Id.  While at the airport, Suchit was permitted to have a visit with his wife, mother, and other

family members, and was offered (and accepted) meals.  Id. at 2. He was allowed to telephone his

wife when he arrived in Miami, and was permitted a second call to his wife when he arrived in

D.C. late that evening.  Id.  Suchit has been held without bond at the D.C. Jail since his arrival.

---

[17]  The parties have, in effect, stipulated to the fact of defendant's appearance in Trinidad court and consent to extradition, as reflected in defendant's motion and the government's response.  Thus, although no testimony was submitted regarding those events, the Court accepts those facts as stipulated.

<u>ANALYSIS</u>

**I.    <u>Defendant's Motion for Return to Country of Origin</u>**

Defendant contends that he should be returned to Trinidad on the ground that his consent to extradition was not voluntary because he was motivated by concerns for his safety in the Trinidad prison and, furthermore, mistakenly believed that the United States would treat him as a cooperating witness rather than as a defendant. <u>See</u> Def.'s Mot. for Return to Country of Origin at 2-5. The government contends that the Supreme Court has upheld the jurisdiction of courts over defendants who were brought to the United States under more egregious circumstances -- forcible abduction from one's home country -- and thus the present case falls well within the scope of the court's jurisdiction. <u>See</u> Gov's Opp. Br. at 4-6 (citing <u>United States v. Mejia</u>, 448 F.3d 436 (D.C. Cir. 2006); <u>United States v. Alvarez-Machain</u>, 504 U.S. 655 (1992)).

The proper focus of the Court's inquiry under the relevant case law is not the degree of force used to obtain custody of the defendant, but rather the terms of the relevant extradition treaty. That is, a court's jurisdiction over a defendant from another country will depend primarily on whether the circumstances of defendant's transfer to the United States violated the terms of the relevant treaty. <u>Alvarez-Machain</u>, 504 U.S. at 667-70. The Supreme Court has emphasized that the terms of the treaty are paramount: "If [the court] conclude[s] that the [t]reaty does not prohibit [defendant's transfer], the rule in <u>Ker</u> applies, and the court need not inquire as to how respondent came before it." <u>Id.</u> at 661-62. The Court has further explained that, under the "rule in <u>Ker</u>" -- referring to <u>Ker v. Illinois</u>, 119 U.S. 436 (1886) -- "'[t]he power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a forcible abduction'" -- or, presumably, by other means involving some lesser degree of force -- absent a violation of the treaty. <u>Alvarez-Machain</u>, 504 U.S. at 661

-15-

(quoting Frisbie v. Collins, 342 U.S. 519, 522 (1952)). The Court reasoned that due process of law is satisfied when the defendant is provided "a fair trial in accordance with constitutional procedural safeguards." Id. at 662. Thus, in Alvarez-Machain, the Supreme Court held that a defendant's forcible abduction from Mexico by DEA agents did not prohibit his trial in the United States, emphasizing that no term of the extradition treaty with Mexico had been violated. Id. at 670.

This Circuit recently held that Alvarez-Machain was controlling where a defendant was transferred to the United States under an informal cooperative arrangement with Panama. See Mejia, 448 F.3d at 443. The court found it dispositive that nothing in the relevant extradition treaty prohibited the transfer; thus the rule of Ker applied, and the jurisdiction of the trial court over the defendant was affirmed. See Mejia, 448 F.3d at 443.

This Court thus first considers whether there was a violation of the United States extradition treaty with Trinidad. See generally Extradition Treaty with Trinidad and Tobago (signed Mar. 4, 1996, entered into force Nov. 29, 1999), Treaty Doc. 105-21, published at 1996 WL 910005. Defendant has not identified a violation of any provision of the extradition treaty with Trinidad nor can the Court discern one. See Def.'s Mot. for Return to Country of Origin at 2-5; Tr., vol. 2, at 6 (conceding that "[w]e are not arguing . . . that the extradition itself violated the treaty," but only that defendant's consent to extradition was not voluntary). Indeed, the treaty states in Article 15: "If the person sought consents to surrender to the Requesting State, the Requested State may surrender the person *as expeditiously as possible without further proceedings*." See id. Art. 15 (emphasis added). Here, Suchit concedes, as he must, that he consented to extradition on June 28, 2006. See Def.'s Motion for Return to Country of Origin at 3 ("[O]n June 26, 2006, on approximately the last day before the US provisional warrant would

have lapsed, Suchit consented to the extradition.").  Moreover, his statement to the FBI two days

later reiterates the unequivocal nature of the consent, as he stated that he wanted to consent to the

extradition even earlier, but delayed his consent because he feared doing so in front of the other

arrestees.  Gov't Ex. 16, at 3.

Defendant contends that the Court must look behind the face of his consent, and

determine whether it was voluntary, suggesting that the Court apply Fourth Amendment and, by

logical extension, Fifth Amendment case law on voluntariness with regard to searches and

confessions.  See Def.'s Mot. for Return to Country of Origin [#39] at 4-5 & n.2.  Defendant

further contends that, under the well-established "totality of the circumstances" standard in

Schneckloth v. Bustamonte, 412 U.S. 218 (1973), his consent was not voluntary because it was

motivated by:  (1) threats to his personal safety from the other arrestees; and (2) a mistaken

subjective belief that he would be treated as a cooperating witness in the United States.  Def.'s

Mot. for Return to Country of Origin at 3-4.

It is not at all clear in light of Alvarez-Machain and Mejia that the Court is free to

superimpose the voluntariness standards of Fourth or Fifth Amendment case law on the

extradition treaty, particularly in light of the Supreme Court's refusal to create implied terms

without a solid foundation for that term in "the practice of nations regarding extradition treaties."

504 U.S. at 667.  Moreover, superimposing an imprecise "totality of the circumstances" standard

would be inconsistent with the Supreme Court's observation that "[e]xtradition treaties exist so as

to impose mutual obligations to surrender individuals in certain defined sets of circumstances."

Id. at 664.  It bears noting, as well, that it would be fundamentally at odds with the core

presumption of Alvarez-Machain -- again, a forcible abduction case -- that the express terms of a

treaty trump any concerns about the voluntariness of a defendant's transfer to the United States.

See Mejia, 448 F.3d at 443 (emphasizing that, in Alvarez-Machain, the use of force in the context of forcible abduction was not prohibited considering that the treaty "'sa[id] nothing about the obligations of the United States and Mexico to refrain from forcible abductions . . . or the consequences under the Treaty if such an abduction occurs.'") (quoting 504 U.S. at 663).[18]

But assuming arguendo that the extradition treaty allows the Court to look behind defendant's consent, the Court finds that the totality of the circumstances indicate that his consent to extradition was voluntary. Defendant concedes that he was formally notified of the pending U.S. hostage taking charges in open court on April 27, 2006. Def.'s Mot. for Return to Country of Origin at 2-3 (stating that the charges were read twice by the Chief Magistrate on or about April 27, 2006, and that "Suchit consented to the extradition" on June 26, 2006). There is no evidence that the Trinidad police or the FBI exerted any pressure on Suchit to consent to extradition, or that misrepresentations were made to obtain his consent.[19] And his incarceration in Trinidad pending extradition proceedings surely put him on notice that he was subject to prosecution. His subjective belief that he would nonetheless be treated as a cooperating witness only further underscores the Court's finding that his consent was voluntary -- that is, one's belief

---

[18] It is worth observing as well that non-resident aliens who have no voluntary connection to the United States cannot invoke the Fourth Amendment with respect to foreign actions by federal officials. United States v. Verdugo-Urquidez, 494 U.S. 259, 274-75 (1990).

[19] Defendant has alleged that Trinidad police told him that he would be treated as a cooperating witness in the United States. No evidence has been submitted in support of this contention. Suchit's statement to Clauss the day of his transfer to the United States reflects, at most, his hope for such treatment.

In any event, it is not only plausible, but commonplace, for cooperating witnesses to remain subject to prosecution, and receive prison sentences at the conclusion of their cooperation. Thus, it is quite plausible that any representation by Trinidad police to Suchit as to his cooperating status in the United States would have been entirely consistent with continued prosecution.

-18-

in a likelihood of favorable treatment in the United States criminal justice system would motivate one to volunteer for extradition. The fact that his hope turned out to be unfulfilled does not render the consent involuntary, just as unilateral mistakes generally do not vitiate the voluntariness of one's actions in either the Fourth or Fifth Amendment contexts. See, e.g., Oregon v. Elstad, 470 U.S. 298, 316 (1985) (emphasizing, in Fifth Amendment context, that "[t]his Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness"); United States v. Hatfield, 365 F.3d 332, 340 (4th Cir. 2004) (defendant's consent to police entry of his home was valid though he did not know who was at the door); United States v. Garcia, 56 F.3d 418, 421-24 (2d Cir. 1995) (defendant's consent to police entry of his home could be valid even though he did not believe he had committed a crime and did not understand the consequences of allowing police to enter, so long as other circumstances do not show government coercion). Simply put, the Court finds that the evidence shows that Suchit was aware of the risk of prosecution in the United States, but freely and voluntarily consented notwithstanding that risk.

This leaves only defendant's contention that his fear of the other arrestees in Trinidad prison rendered his consent to extradition involuntary.[20] See Gov't Ex. 16, at 3. As noted above, however, defendant had been living under a similar cloud of fear during the seven-month period of his cooperation with Trinidad police and the FBI, but remained able to make independent decisions regarding his safety. Indeed, he declined the offer from Trinidad police to be relocated, opting instead to stay with a relative. See Tr. at 138-39. He also continued to provide

---

[20] As noted in the Court's suppression analysis infra, psychological pressure from private actors, in contrast to the government, is not, standing alone, relevant under a traditional due process voluntariness analysis.

cooperation on numerous occasions, and even on his way to the United States stated that he hoped to continue his cooperation. This kind of independent decisionmaking indicates that his will was not so overborne that he lacked the ability to make voluntary choices. See United States v. Hall, 969 F.2d 1102, 1108 (D.C. Cir. 1992) (actions that "demonstrate a capacity to make autonomous decisions" when police are present indicate a defendant has the ability to make voluntary choices). Thus, Suchit's fear of other arrestees does not vitiate the voluntariness of his consent to extradition. Looking at the totality of the circumstances -- the actual notice he received in Trinidad court of the pending U.S. charges, the wholesale absence of any coercion from Trinidad police or the FBI, his desire to continue cooperating, and his record of independent decisionmaking -- the Court finds that Suchit freely and voluntarily consented to extradition.

## II.   Defendant's Motion to Suppress

Defendant moves to suppress certain written documents purporting to describe oral statements made by him. These fall into two categories: (1) his two oral statements to the FBI -- the first on October 4, 2005 and the other on February 17, 2006 (see Gov't Ex. 2 and 9); and (2) three oral statements to the Trinidad police on September 28, 20005, January 8, 2006, and March 1, 2006 (see Gov't Ex. 1, 5, and 10). Defendant has stipulated that he does not seek to suppress documents pertaining to his statements to Trinidad police in or around January 26, 2006 (Gov't Ex. 7 and 8) and his statement to the FBI on June 28, 2006 (Gov't Ex. 16). Tr. at 9-11. Nor does defendant seek to suppress the Forbes memoranda dated October 6 and 7, 2005 (Gov't Ex. 3 and 4). Tr. at 82-87.

### A.   Defendant's Statements to the FBI

Defendant contends that his statements to the FBI on October 4, 2005 and February 17, 2006 must be suppressed because he was not provided with Miranda warnings prior to

questioning and that, in any event, applying due process standards, the statements should be

excluded as involuntary in light of allegedly coercive conduct by Trinidad police. The

government acknowledges that traditional Fifth Amendment standards govern the admissibility

of those statements at trial,[21] but contends that Miranda warnings were not required because

defendant was not in custody and his statements were voluntarily made.

### 1.    The Custody Element

An officer's obligation to administer the warnings described in Miranda v. Arizona, 384

U.S. 436 (1966), is triggered "'only where there has been such a restriction on a person's freedom

as to render him 'in custody.'" Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam)

(quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). The Supreme Court has addressed the

definition of "custody" in several cases, but has emphasized that "the ultimate inquiry is simply

whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree

associated with a formal arrest." Stansbury, 511 U.S. at 322 (quoting California v. Beheler, 463

U.S. 1121, 1125 (1983) (per curiam)) (emphasis added); see also United States v. Calloway, 298

---

[21] Some courts have recognized that the Fifth Amendment privilege against self-incrimination protects nonresident aliens facing a criminal trial in the United States even where the questioning by United States authorities takes place abroad. See United States v. Bin Laden, 132 F. Supp. 2d 168, 181-87 (S.D.N.Y 2001); see also United States v. Karake, 443 F. Supp. 2d 8, 49 n.71 (D.D.C. 2006) (noting United States' acknowledgment that "Miranda warnings are required where United States officials conduct [a custodial] interrogation abroad"); United States v. Yousef, 327 F.3d 56, 145-46 (2d Cir. 2003) (noting that where United States law enforcement agents participate in questioning abroad, Miranda warnings may be required). This proposition is based on the status of the privilege against self-incrimination as a "fundamental trial right," as to which a violation occurs not at the moment of custodial interrogation, but at the time a defendant's statement is used against him at an American criminal proceeding. See Bin Laden, 132 F. Supp. 2d at 182-84 (quoting United States v. Verdugo-Urquidez, 494 U.S. 259, 264 (1990)). The government thus concedes the applicability of the Fifth Amendment to the FBI actions at issue. Gov't Opp. Br. [#43] at 18-20 ("This 'trial right' distinction . . . mandates that the protections of the Fifth Amendment . . . be extended to nonresident aliens tried in the United States.").

F. Supp. 2d 39, 47-48 (D.D.C. 2003) (discussing Beheler and subsequent cases, and concluding that "the circumstances surrounding the interrogation must constitute the functional equivalent of a formal arrest") (emphasis in original).  The relevant inquiry is an objective one focusing on "how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984).  Hence, the "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by the interrogating officer or the person being questioned." Stansbury, 511 U.S. at 323.  The defendant bears the burden of proving custody by a preponderance of the evidence.  See United States v. Goldberger, 837 F. Supp. 447, 452 n.4 (D.D.C. 1993).

Applying these standards, the Court finds that the evidence readily establishes that defendant was not "in custody" at the time of either interview with Special Agent Clauss.  The day before the October 4, 2005 interview, Suchit indicated to Neermal that he was eager to meet with the FBI -- conduct that was consistent with his decision to meet twice with Constable Forbes only days earlier.  Suchit was clearly aware of and interested in the Trinidad and U.S. reward money, and offered his knowledge of the Maharaj abduction based on that financial interest.  He expressed strong interest in the reward money in his talks with Neermal and on multiple occasions with Special Agent Clauss.  During the interview, Suchit was not restrained in any manner, and appeared calm, relaxed, and eager to provide information.  After the interview was done, the Trinidad police drove him to his home.  All of these circumstances indicate a consensual meeting, rather than the functional equivalent of an arrest.

Defendant contends that custody should nonetheless be found, based on the actions of the Trinidad police -- that is, the use of handcuffs when the police arrived at Suchit's house the day before the interview and the length of time defendant spent at the Trinidad police station --

roughly, 30 to 36 hours.  Assuming <u>arguendo</u> that the FBI can be held accountable for the actions of the Trinidad police,[22] the Court finds that these circumstances do not establish that Suchit was in custody.  As to the cuffing, defendant clearly feared that public disclosure of his cooperation could result in harm to his family, and would take efforts to hide his cooperation.  Thus, when Forbes arrived at Suchit's home the morning of October 3, it is more likely than not that he placed Suchit in handcuffs to create the appearance that Suchit was under arrest, much like the January 2006 fake arrest at the Arouca police station in front of Doreen Alexander.

With respect to the overnight stay at the police station, the Court finds that, more likely than not, his stay was occasioned by the uncertainty surrounding the exact time of the interview and thus, viewed in context, does not indicate a restraint amounting to an arrest.  Clauss testified that, under his arrangement with Forbes, the interview would take place on the date his flight arrived in Trinidad, October 4, but the exact time remained undetermined.  Thus, more likely than not, Forbes drove Suchit to the police station the day before to ensure that Suchit would be available to meet with Clauss at a moment's notice on October 4.  And indeed, a moment's notice was all that Forbes received -- Clauss telephoned Forbes from the Port-of-Spain airport to notify Forbes of his arrival and sought to interview Suchit right away.   Although there is no evidence indicating how the police treated Suchit at the station on that occasion, the evidence indicates that, on other occasions, he was allowed to watch television and smoke without being physically restrained, and there is no reason to believe that his October 3-4 stay at the police station was any different.  Additionally, Suchit's consent to the FBI interview -- again spurred by his financial

---

[22]  <u>See</u> <u>infra</u> Section II.B at 27-28 & n. 25 (discussing standards for determining admissibility of statements made abroad to foreign officers based on the "joint venture" doctrine and the factual record on the relationship between the United States and Trinidad).

interest -- significantly mitigates the restrictiveness that one might otherwise associate with a station house stay of this duration. Thus, looking at all of the circumstances surrounding the interview, including the actions of the Trinidad police, the Court finds that the restraints on Suchit's freedom of movement on October 3 and 4, 2005, fall far short of the functional equivalent of a formal arrest.

As to Suchit's second statement to Clauss, the record is devoid of any indicia of custody -- a point conceded by defense counsel at the hearing. See Tr., vol. 2, at 16 ("As to the latter, the February statement, I don't believe that I can make any legal argument about custodial interrogation."). The only arguably restrictive circumstance was the location of the interview at the Arouca police station, as the record is undisputed that Suchit was not handcuffed and that his liberty was not restrained. The Supreme Court has repeatedly rejected the proposition that questioning of a suspect at a station house, standing alone, constitutes custody. See Beheler, 463 U.S. at 1125 ("we have explicitly recognized that Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect'") (quoting Mathiason, 429 U.S. at 295). Because Suchit was not in custody at the time of either FBI interview, no Miranda warnings were required to render the statements admissible at the trial of this matter.

## 2.    The Voluntariness of the Statements

Defendant suggests that the statements should nonetheless be suppressed as involuntary under the Due Process Clause of the Fifth Amendment. The Supreme Court has recognized that, where statements "fall outside the sweep of the Miranda presumption, the primary criterion of admissibility [remains] the 'old' due process voluntariness test." See Oregon v. Elstad, 470 U.S. at 307-08. The due process voluntariness test, like the standard for "custody," looks at the

constraints upon a defendant's freedom, but instead of focusing on whether the circumstances are tantamount to an arrest, looks at the overall voluntariness of a defendant's statement. Under the voluntariness test, the statement must be "the product of an essentially free and unconstrained choice," in contrast to one obtained through coercive means. See Schneckloth, 412 U.S. at 225-26; Karake, 443 F. Supp. 2d at 50. "If [the defendant's] will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." Schneckloth, 412 U.S. at 226. Thus, it is possible that a defendant may not be "in custody" as contemplated by Miranda and its progeny, but his statement must nonetheless be suppressed because the police used coercive tactics to obtain a confession. See United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991) ("[The Due Process Clause] requires that a confession be voluntary quite apart from whether or not Miranda's prophylactic procedures are followed."). The government bears the burden of proving by a preponderance of the evidence that a defendant's statements are voluntary. See Lego v. Twomey, 404 U.S. 477, 489 (1972). The government has easily satisfied that burden here.

As noted above, the evidence overwhelmingly indicates that Suchit affirmatively sought to act as a cooperating witness to advance his claim on the reward money, and his interviews with the FBI were two parts of a series of independent actions in advancing that claim. As early as April 15, 2005, he had contacted Crimestoppers about the kidnapping without any prompting from police, and he made four additional phone calls to Crimestoppers in May 2005. Months later, outside of any police presence, Suchit told Neermal that he would be willing to meet with Trinidad police and later expressed willingness to meet as well with the FBI. Thus, Suchit's course of conduct in the months preceding his FBI interview provide strong indicia that he was inclined to cooperate with law enforcement on his own initiative and thus that his interview was

voluntary.  Clauss's observations of Suchit during the interviews further confirm the conclusion that Suchit acted voluntarily -- on both occasions, Suchit was calm and eager to provide information, expressing concern only about keeping his status as an informant confidential and seeking to ensure his safety.

Defendant's characterization of his statements as involuntary based on physical abuse by the Trinidad police on October 3-4, 2005, lacks any evidentiary support.  Defendant alleges, in his brief, that the Trinidad police, held him for over 24 hours without providing any food or drink, refused requests for restroom breaks, made unspecified threats, hit him on the head with a large book, and told him he would be charged with the Maharaj kidnapping if he did not speak.  Def.'s Mot. to Suppress at 8.  But there is no evidence whatsoever in support of these allegations.  The only potential indicia of coercive tactics are his placement in handcuffs at his residence on October 3 and his overnight stay at the Arouca station; however, the Court already has concluded that the handcuffs and the extended stay may have been means to protect Suchit's status as an informant and to ensure his availability for an interview that was mutually desired, rather than being coercive in nature.  Clauss had the opportunity to observe plaintiff on October 4 over the course of a four- to five-hour interview and saw no evidence of physical abuse, nor did he observe any fear or anxiety between Suchit and Forbes.  Four of defendant's family members have submitted written statements to defense counsel's investigator, which describe in detail their recollection of the events on October 3 and 4 but fail to make any mention of abuse.  Indeed, defendant's investigator has testified that Soogan and Wayne Suchit told him that defendant made no mention of any abuse.  Thus, the Court finds on the record before it that Suchit was not abused prior to the October interview.  Considering the totality of the circumstances, the Court concludes that defendant's statements to the FBI were the product of an essentially free and

unconstrained choice -- a choice to cooperate and stake a claim to the reward money.  The statements were, therefore, voluntary.

### B.    Defendant's Statements to the Trinidad Police

Defendant contends that his statements to the Trinidad police on January 8 and March 1, 2006 should be suppressed on the ground that the Trinidad police were required to provide Miranda warnings under the "joint venture" doctrine, but failed to do so, and that, in any event, applying due process standards, the statements should be excluded as involuntary.  In determining whether Suchit's statements to the Trinidad police are admissible, the Court follows the same analytical framework that it has applied to determine the admissibility of the statements to the FBI -- first, was the defendant subject to a custodial interrogation triggering Miranda's procedural safeguards, and second, did he make the statements voluntarily.

The Court observes, however, that when a person makes a statement to foreign police officers abroad, rather than U.S. officers, additional issues regarding the reach of the Constitution may arise -- issues which need not be resolved here.  The first is the threshold issue of the applicability of Miranda to statements obtained by foreign officers acting abroad.  Such statements generally are not governed by Miranda unless, under the "joint venture" doctrine,[23] United States law enforcement agents actively participate in the questioning of the defendant or

---

[23]  The joint venture doctrine also has been applied in the Fourth Amendment context to determine whether evidence from searches conducted abroad by foreign officials may be admitted at trial.  See United States v. Behety, 32 F.3d 503, 510-11 & n.9 (11th Cir. 1994); United States v. Mount, 757 F.2d 1315, 1317 (D.C. Cir. 1985); Stonehill v. United States, 405 F.2d 738, 743 (9th Cir. 1968); Berlin Democratic Club v. Rumsfeld, 410 F. Supp. 144, 154 (D.D.C. 1976).

the foreign officials act as agents or virtual agents of the United States.[24]  See Yousef, 327 F. 3d at 145-46; United States v. Abu Ali, 395 F. Supp. 2d 338, 380 (E.D. Va. 2006); United States v. Karake, 281 F. Supp. 2d 302, 308 (D.D.C. 2003).  The second issue is whether -- in the absence of any U.S. involvement -- the admissibility of a defendant's statement should be assessed under the Due Process Clause by the traditional "voluntariness" standard or a "shocks the conscience" standard, or instead is admissible without regard to either standard.  See United States v. Karake, 443 F. Supp. 2d 8, 52-53 & nn.73-74  (D.D.C. 2006) (discussing whether the standard is "shocks the conscience" or voluntariness, suggesting the latter is correct); Abu Ali, 395 F. Supp. 2d at 380 (applying a "shocks the conscience" standard); United States v. Wolf, 813 F.2d 970, 972 n.3 (9th Cir. 1987) (questioning whether constitutional protection against involuntary confessions applies to confessions coerced by foreign police in light of Colorado v. Connelly, 479 U.S. 157 (1986)). This Court need not resolve those issues here because -- assuming arguendo that the actions of the Trinidad police and FBI constitute a "joint venture" -- an assumption that is very much in doubt[25] -- defendant was not "in custody" at the time of either statement to the Trinidad police, nor do the circumstances indicate that the statements were anything other than voluntary.

---

[24] There is not, however, a consensus on the level of cooperation necessary to support a finding of a "joint venture."  See Yousef, 327 F.3d at 146.

[25] Defendant argues that a joint venture is indicated by the involvement of the Embassy and the FBI in the investigation of the kidnapping from its early stages to his extradition, the frequent FBI trips to Trinidad, and the high level of cooperation among law enforcement officers, including information-sharing.  Tr., vol. 2, at 31-38.  The government contends that such cooperation and information-sharing is insufficient, arguing instead that a "joint venture" is established only if the United States is "substantially involved" with a foreign official's detention and interrogation of the defendant, or the United States uses a foreign official to circumvent a defendant's Fifth Amendment rights.  Id. at 50-52; see also Gov't Opp. at 16-17 (citing Abu Ali, 395 F. Supp. 2d at 380).  The government further notes that, even under the lens of information-sharing, a joint venture is not established, as indicated by the FBI's independent fact-gathering (e.g., interviewing witnesses separately from the Trinidad police) and their inability to obtain requested information.  Tr., vol. 2, at 52-53.

1.     **The Custody Element**

As before, the Court first considers whether there was a formal arrest or restraint on freedom of movement that was the functional equivalent of an arrest. Little needs to be said about the September 28, 2005 questioning. The evidence readily establishes that the meeting was set up by Neermal who was personally acquainted with Suchit, that the meeting was an introductory one that took place in the nonrestrictive setting of Neermal's residence, and that no restrictions whatsoever were placed on Suchit's freedom of movement -- a matter that defendant has virtually stipulated. See Mot. to Suppress at 6 (stating "Suchit was at Nimal's [sic] house when he was introduced to Officer Forbes," and describing the meeting without reference to any restrictions). Given the wholesale absence of restraints on Suchit's freedom of movement, the Court easily concludes that Suchit was not "in custody."

Looking at the circumstances surrounding Suchit's January 8 statement, the Court again finds that Suchit was not "in custody." The evidence indicates that, three months after Suchit's October 4 statement to Clauss, Suchit was asked to return to the Arouca police station to make a further statement about the kidnapping. Suchit arrived at the station the morning of January 8 to provide the statement, and was left waiting for several hours with Constable Gosyne. The delay was caused by the renewed focus of police attention on the search for Maharaj's remains. During that time, he watched television in the station's Homicide Office, spoke with Gosyne about the status of the search, and was free to move about. After the search was done, Suchit made his statement over a period of about three hours, which was recorded by Gosyne, and reviewed and signed by Suchit. None of these events are of the sort that would lead a reasonable person to believe he was under arrest. Thus, looking at the totality of the circumstances, the Court again finds that Suchit was not in custody.

The circumstances surrounding the March 1, 2006 statement present an even weaker case for "custody." The statement once again took place at the Arouca police station with Constable Gosyne, who set up the interview to clarify aspects of Suchit's January 8 statement. This time, the interview was much shorter, running from 8:05 a.m. to 8:50 a.m. Suchit appeared normal and relaxed. Little else is known about the interview, but the Court finds it unlikely that there is much else to tell. This was one of a series of interviews in which Suchit voluntarily participated, much like the one on January 8, and the FBI interview on February 17. There is no arguable indicia of "custody" other than the location of the interview at the station house. And the Supreme Court has emphatically held that the station house location, alone, cannot be the basis for finding a defendant "in custody." See Beheler, 463 U.S. at 1125 ("we have explicitly recognized that Miranda warnings are not required 'simply because the questioning takes place in the station house'").

### 2.    The Voluntariness of the Statements

Defendant contends that his statements to the Trinidad police should be suppressed as involuntary under the Due Process Clause. The Court once again reviews all of the evidence to determine whether Suchit's will was overborne, or his capacity for self-determination critically impaired, and again, finds no indicia of involuntariness. With regard to the January 8, 2006 statement, it is evident that Suchit was not in a coercive environment. He watched television and engaged in conversation with Gosyne about the status of the search for the victim's body. Indeed, the next day, Suchit appeared before a Justice of the Peace and signed a declaration under Trinidad law that he had made the statement "voluntarily and of [his] own free will," and that no threats or promises had been made to him. The declaration is by no means dispositive because, in theory, it could have been obtained under coercive circumstances. But no such circumstances

are alleged, and the presence of a judicial officer further diminishes the likelihood that there were coercive circumstances when he signed the declaration.  Moreover, the course of events in the days preceding the statement also indicate the statement was voluntary.  Only three days earlier, Suchit had provided assistance in the arrests of Doreen Alexander and Anderson Straker under circumstances that indicated he had a voluntary cooperative relationship with the police.  He was driven to the station by police, uncuffed, to identify Doreen, and once done with that task, he was uncuffed, and smoked and conversed with officers in the station parking lot.  Later that day, Suchit offered to help the officers locate Straker, and was successful in telephoning Straker that evening to discover his whereabouts.  Based on the events on January 8, and the other contemporaneous events indicating a voluntary cooperative relationship with the police, the Court concludes that his statement was voluntary.

Similar facts support the conclusion that the March 1 statement was voluntarily made. Suchit came to the station at the request of Constable Gosyne to clarify his January 8 statement. Indeed, it appears that his interview was timed to coincide with his receipt on March 1 of a subsistence payment from the Witness Protection Programme.  His statement was relatively short -- 45 minutes -- and he appeared normal and relaxed. Two days later, he signed the standard statutory declaration form before a Justice of the Peace stating that he had made the statement "voluntarily and of his own free will," with no threats or other inducements, and as with the January 8 declaration, there are no circumstances alleged that would give one reason to suspect that declaration was coerced.

The Court pauses here to recognize that defendant has made frequent references to his subjective state of mind, specifically with regard to his overarching fear of retaliation from other suspects and arrestees that pervaded his life during the period of his cooperation.  It is unclear,

however, how this factors into the voluntariness analysis. The Supreme Court has emphasized that "[t]he sole concern of the Fifth Amendment . . . is governmental coercion," in contrast to pressures from other external sources. See Connelly, 479 U.S. at 170. Thus, in the absence of some coercive police action that exploits a person's mental state, defendant's subjective fears of retaliation from other suspects cannot support a finding of involuntariness. Id. at 164 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."); Elstad, 470 U.S. at 304-05 (observing that the Constitution is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion"); Hall, 969 F.2d at 1108 n.6 (describing Connelly as indicating that a subject's particular "vulnerable, subjective state" is relevant to admissibility of a confession only insofar as the police knowingly took advantage of that vulnerability, but questioning whether Connelly applies in the Fourth Amendment context). Here, there is no evidence that the Trinidad police somehow took advantage of Suchit's fears to obtain any of the statements. Indeed, to the contrary, the Trinidad police offered to relocate Suchit and provided payments to him under their Witness Protection Programme. Moreover, even if Suchit's fear were relevant to the voluntariness inquiry, his fear did not impair his ability to exercise his free will. Suchit made independent decisions regarding his safety, including refusing the offer from Trinidad police to be relocated, opting instead to stay with a relative. This kind of independent decisionmaking indicates that his will was not so overborne that he lacked the ability to make voluntary choices. See Hall, 969 F.2d at 1108.

 The Court also pauses to look at these two statements in the context of Suchit's relationship with the Trinidad police and the FBI over the entire seven-month period of his cooperation, particularly in light of defendant's contention that some statements were tainted by

others.[25]  When viewed in this regard, one sees that each of the five statements was part of a series of statements provided by a self-initiated cooperating witness (later formalized in the Trinidad Witness Protection Programme), and was made with an eye toward obtaining the reward money.  Suchit was not physically abused or otherwise threatened by the Trinidad police or the FBI during the course of that relationship.  Both authorities made efforts to protect his safety by keeping his identity confidential, disguising his appearances at the police station, providing subsistence payments to him, and making officers available to him to hear his concerns.  The Court is fully satisfied that, whether viewed alone or collectively, Suchit's statements to the Trinidad police were the product of a free and unconstrained choice and, thus, voluntary.

## CONCLUSION

For the foregoing reasons, the Court denies defendant's motion requesting return to his country of origin and his motion to suppress statements.  A separate order will be issued herewith.

                                                    /s/
                                       _____
                                       JOHN D. BATES
                                       United States District Judge

Dated:   March 15, 2007

---

[25]  Whether or not a prior tainted confession is alleged, the Supreme Court has emphasized that the voluntariness inquiry is, in principle, the same: "As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements."  Oregon v. Elstad, 470 U.S. at 318.  Thus, although the "tainting" label does not apply -- a label which is of little legal consequence -- the Court has looked at all of the statements collectively to see if that would alter the analysis in any respect.  It would not.