IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| | § | |
| - vs - | § | CRIMINAL No.  06-102-02 (JDB) |
| | § | |
| | § | |
| **DAVID SUCHIT,  *el al.*** | § | |
| | § | |
| Defendants. | § | |
| | § | |

**_____GOVERNMENT'S OPPOSITION TO DEFENDANT SUCHIT'S
SECOND SUPPLEMENT TO DEFENDANT'S MOTION TO MOTION
TO DISMISS INDICTMENT BASED UPON DUE PROCESS VIOLATIONS**

_____The United States of America ("United States" or "Government") opposes defendant

David Suchit's Second Supplement to Defendant's Motion to Dismiss Indictment Based Upon

Due Process Violations ("Defendant's Supplemental Motion") because, as set forth below,  it is

without merit.

***Nature of the Case***

Defendant David Suchit ("Mr. Suchit" or "defendant") is one of twelve Trinidadian

nationals who have been indicted in the District of Columbia for Conspiracy to Commit Hostage

Taking Resulting in Death and with Hostage Taking Resulting in Death, both charges being in

violation of 18 U.S.C. § 1203(a).  According to the allegations of the superseding Indictment,

beginning on or about February 1, 2005 and ending on or about April 15, 2005, Mr. Suchit and

his co-conspirators, embarked upon a common plan to obtain the money of American citizen,

Balram Maharaj, who was a visitor to the Island of Trinidad and who had relatives there.  The

conspirators' initial plan was to kidnap Mr. Maharaj's 5-year old son, Dinesh Maharaj, and to

hold Dinesh for ransom. However, the conspirators later discarded the initial plan and determined to kidnap Balram Maharaj and sought to obtain a ransom of Mr. Maharaj's money, from Mr. Maharaj's relatives, for his release. On April 6, 2005, in accordance with their plan, Balram Maharaj was abducted. and a ransom of $3,000,000 Trinidad (approximately $500,000 US) was demanded for his release. Mr. Maharaj was held captive at a hideout in a mountainous jungle region of Trinidad. On or about April 13, 2005, Mr. Maharaj expired at the remote hideout, as he languished in the hands of the conspirators. Following Mr. Maharaj's death, members of the conspiracy dismembered his body and buried his body parts at another remote location in the mountainous jungle.

By April 15, 2005, the ransom demands had ceased.

On April 27, 2005, the United States Embassy issued a press release, *inter alia*, offering a reward of $10,000 US for information leading to the location of Mr. Maharaj and to the arrest and conviction of those responsible for the abduction of Balram Maharaj.

In January of 2006, Mr. Maharaj's dismembered and decomposed body was located in a mountainous jungle region in Trinidad.

## The Allegations of Defendant's Supplemental Motion

In his Supplemental Motion, Mr. Suchit claims essentially that various alleged records and statements are not readily available in the United States prosecution of Mr. Suchit and therefore all charges against him should be dismissed. In his Supplemental Motion, Mr. Suchit claims that the Government, not the defendant, should be "held accountable" for searching and acquiring the various items Mr. Suchit sought in his April 2, 2007 Letters Rogatory to the Republic of Trinidad. [*See* Supp. Mo., pages 2-3] The Supplemental Motion claims that Mr.

-2-

Suchit "requested the production of official logs, as well as perusal of investigative files," and

that "[o]f particular importance to the defendant, and one of the matters at issue by this motion,

are the investigative files of CID (believed to be the Criminal Intelligence Division), if any."

[Supp. Mo., page 3]  Mr. Suchit's Supplemental Motion advances his claims under three

analyses: (1) whether the Government's *Brady/Giglio/Bagley* obligations include a duty to search

filed in the possession of Trinidad & Tobago governmental entities to determine if they contain

any exculpatory evidence [*see* Supp. Mo., pages 4-8]; (2) the appropriate remedy for the

Government's failure to discharge its alleged duty to search the official files of the Trinidad &

Tobago governmental entities [*see* Supp. Mo., pages 8-9]; and (3) whether the Government's

inability to obtain from Trinidad & Tobago statements of witnesses negates the Government's

duty under Jencks to disclose such statements. [*See* Supp. Mo., pages 9-10]

        In essence, while correctly observing that "the scope of the prosecutor's duty ... in the

instant case .... appears to be a question of first impression" [Supp. Mo., page 6], Mr. Suchit's

Motion thereafter seeks to foist upon the Government an unlimited duty to obtain, under sanction

of dismissal, limitless records from foreign sovereigns, officials, and entities, over which it has

no control.  As shown below, the allegations of Mr. Suchit's Motion are without merit.

### THE ALLEGATIONS OF DEFENDANT'S MOTION ARE WITHOUT MERIT AND SHOULD BE DENIED

        The is "no general constitutional right to discovery in a criminal case." *Weatherford v.

Bursey*, 429 U.S. 545, 559 (1977).  Nevertheless, the Constitution mandates that a defendant be

accorded the opportunity to present a defense.  *See, e.g., Chambers v. Mississippi*, 410 U.S. 284,

302 (1973); *United States v. Libby*, 453 F.Supp.2d 35, 42 (D.D.C. 2006) (Walton, J.).   In this

regard, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall

enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. It is well-settled that this right is not without limits. The defendant's right to compulsory process extends only where it is within the Government's power to provide it. *See United States v. Moussaoui*, 382 F.3d 453, 463 (4th Cir. 2004), cert. denied, 544 U.S. 931 (2005); *United States v. Greco*, 289 F.2d 247, 251 (2d Cir. 1962). The principle is "well established and undisputed ... that the process power of the district court does not extend to foreign nationals abroad."[1] *Moussaoui*, 382 F.3d at 463-64; *and see United States v. Yates*, 345 F.3d 1280, 1283 (11th Cir. 2003); *United States v. Olafson*, 213 F.3d 435, 441 (9th Cir. 2000); *United States v. Filippi*, 918 F.2d 244, 246 n.2 (1st Cir. 1990); *United States v. Zabaneh*, 837 F.2d 1249, 1259-60 (5th Cir. 1988); *cf., United States v. Liner*, 435 F.3d 920, 924 (8th Cir. 2006).

The Sixth Amendment does not:

> [C]onfer upon the defendant an absolute right to compel the presence of any witnesses the defendant may choose. Rather, a criminal defendant has a constitutional right to compel the presence of witnesses "in his favor." Thus, to compel the presence of a witness under the Sixth Amendment, a defendant must

---

[1] However, if a court is unable to secure the presence of an overseas witness, it may authorize depositions to be taken abroad that may, under limited circumstances, be admitted into evidence in a criminal trial. *See* Fed. R. Crim. Pro. 15; *United States v. Medjuck*, 156 F.3d 916 (9th Cir. 1998); *United States v. McKeeve*, 131 F.3d 1, 8 (1st Cir. 1997); *United States v. Gifford*, 892 F.2d 263 (3d Cir. 1989); *United States v. Salim*, 855 F.2d 944 (2d Cir. 1988). In order to establish the requisite "exceptional circumstances," the party must "show the witness's unavailability and the materiality of the witness's testimony." *United States v. Lanier*, 435 F.3d 920, 924 (8th Cir. 2006); *see also United States v. Kelley*, 36 F.3d 1118, 1125 (D.C. Cir. 1994) (identifying same two "critical factors"). In addition, some Courts require proof that the "testimony is necessary to prevent a failure of justice," or other considerations. *See United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001); *see also United States v. Ruiz-Castro*, 92 F.3d 1519, 1533 (10th Cir. 1996) (identifying the three factors as among those to be considered); *United States v. Thomas*, 62 F.3d 1332, 1342 (11th Cir. 1995) (listing consideration of unavailability, materiality, and "countervailing factors [that] would make the deposition unjust to the nonmoving party"); *United States v. Aggarwal*, 17 F.3d 737, 742 (5th Cir. 1994) (denial of the motion may be based entirely upon the fact it is untimely).

> show that the witness will have information that is material and favorable to his
> defense, and not merely cumulative of the testimony of other available witnesses.

*United States v. Bin Laden*, 2005 WL 287404, *10 (S.D.N.Y. 2005) (internal citations quotations omitted.)  In order to be "material," there must be a "reasonable probability" that its disclosure to the defense would change the result of the proceeding."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Thus, "materiality" is not established merely by showing the witness was a participant or witness to the crime charged.  *See United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988).[2]  Speculation and conjecture will not suffice, *United States v. Ginsburg*, 758 F.2d 823, 831 (2d Cir. 1985), nor will the "mere possibility" that the information might have helped the defense.  *United States v. Agurs*, 427 U.S. 97, 109-110 (1976).

The prosecution has no obligation to conduct a separate investigation for the purpose of responding to the defendant's discovery requests.  *United States v. Bin Laden*, 2005 WL at *12. Rather, the prosecution has the obligation to disclose evidence in its possession or reasonably available to it that is both favorable to the accused and material either to guilt of to punishment. *United States v. Bagley*, 473 U.S. 667, 674 (1985).

In *United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004), *cert. denied*, 544 U.S. 931 (2005), a related issue turned on whether the *custodian* of the foreign witnesses (presumably enemy combatants in United States custody in a foreign land) could be compelled to produce the witnesses for trial in the United States.  *Id.* at 464-66.  In *Moussaoui*, the Fourth Circuit, found that the *custodian* of the witnesses was within the reach of the District Court's writ *ad*

---

[2]  Among other things, a defendant's Sixth Amendment compulsory right, and his right to present a defense, generally yield to a prospective witness' Fifth Amendment privilege against self incrimination.  *See, e.g., Carter v. United States*, 684 A.2d 331, 335 (D.C. 1996) (*en banc*).

*testificundum.  Id.* at 466; *and see United States v. Cruz-Jiminez*, 977 F.2d 95, 99-100 (3d Cir.

1992); *Muhammad v. Warden*, 849 F.2d 107, 114 (4th Cir. 1988); *United States v. Paracha*, 2006

WL 12768, *15 (S.D.N.Y. 2006); *accord Carbo v. United States*, 364 U.S. 611, 620-21 (1961)

(writ *ad prosequesndum*).[3]

In sum, in a prosecution such as this, the Government's burden[4] should be that the

Government is obliged to provide to the defense evidence that is either (1) in the Government's

possession, or (2) reasonably available to the Government, and (3) that is both favorable to the

accused and material either to guilt of to punishment.  *See United States v. Bagley*, 473 U.S. 667,

674 (1985).[5]

As set forth below, the Government has discharged its burden.

## THE GOVERNMENT HAS DISCHARGED ITS BURDEN

### *Prosecutions for Domestic vs. International Crimes*

At bottom, Mr. Suchit's Supplemental Motion suggests that the Government has greater

responsibilities with regard to its prosecution of Mr. Suchit because his crimes were committed

in Trinidad & Tobago than it would if Mr. Suchit had committed his crimes in the United States.

---

[3]  In *Johnson v. Eisentrager*, 339 U.S. 763, 781-85 (1950), the supreme court held that the writ of habeas corpus *ad sujiciendum* did not extend constitutionally to enemy aliens held abroad. However, this does not necessarily resolve whether 28 U.S.C. § 2241 may make the writ available as a matter of statutory – rather than constitutional – law.  *See Rasul v. Bush*, 542 U.S. 466 (2004).

[4]  The existence of a burden on the Government does not relieve the defendant from his independent obligation timely and vigorously to pursue available avenues to obtain evidence he seeks.  *See, e.g., United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003).

[5]  As observed by the Fourth Circuit in *Moussaoui*:  "We agree with the Government's premise; there can be no doubt that, were it not for the capture of these [presumably: enemy combatant] witnesses, Moussaoui could not hope to obtain their testimony."  *Id.* at 464 n.16.

Although Mr. Suchit's view contains a certain initial magnetism, generally speaking, it is misguided.[6]  If Mr. Suchit and his co-conspirators had come from Trinidad & Tobago and held hostage an American citizen in the United States and, thereafter, had returned to Trinidad & Tobago, much of the information he currently seeks would likewise be outside the reach of a District Court's subpoena and writ powers.  What if Mr. Suchit and his co-conspirators abducted the victim from the United States and took him to Trinidad & Tobago, where he was held hostage, killed and buried.  Under these circumstances, virtually all of the information Mr. Suchit seeks would likewise reside in Trinidad & Tobago?  Could Mr. Suchit seriously argue that the charges against him in the United States should be dismissed?

What if Mr. Suchit and his co-conspirators committed a hostage-taking and murder in the United States, but persons with knowledge of relevant facts fled to Iran or North Korea, and were therefore outside the authority of a District Court's writ or subpoena?   Would Mr. Suchit be entitled to a dismissal of the charges against him under such circumstances?

As indicated above, in a strictly American prosecution, of an American defendant, for a crime on American soil, against an American victim, the defendant is not entitled to obtain everything he might want in preparation of his defense.  The prosecution has no obligation to conduct a separate investigation for the purpose of responding to the defendant's discovery

---

[6]  It is, respectfully, disingenuous for Mr. Suchit's Supplemental Motion to claim that the charges against Mr. Suchit should be dismissed because the Trinidadian government was, apparently, not going to charge him criminally for his role in the conspiracy and hostage-taking of Balram Maharaj.  How the sovereign government of Trinidadian & Tobago chooses to exercise its prosecutorial discretion is strictly its concern.  As the United States Government will prove at trial, Mr. Suchit's actions violated the statutes and laws of the United States.  It is the right of the United States to vindicate its independent interests in its prosecution of Mr. Suchit for his violations of its sovereign laws.

requests.  *See United States v. Bin Laden*, 2005 WL at *12.  Rather, the prosecution has the

obligation to disclose evidence in its possession or reasonably available to it that is both

favorable to the accused and material either to guilt of to punishment.  *United States v. Bagley*,

473 U.S. 667, 674 (1985).

**The Government's Efforts in this Case Went Substantially
<u>Above and Beyond Its Duty</u>**

Mr. Suchit's Supplemental Motion does not claim – nor could it -- that the Government

has acted other than in the utmost good faith.  The Government has provided (or at the

appropriate time will provide) Mr. Suchit with discoverable materials that are in its possession.

Further, the Government has specifically sought from the Trinidadian government,[7] and from its

officials, and from TSTT, the private telephone carrier for Trinidad & Tobago, information

sought by Mr. Suchit.[8]  Thus, when it came to the attention of the Government that Mr. Suchit

sought certain information and/or documentation, rather than stand idly by, the Government

affirmatively and vigorously sought to obtain the information and/or documentation so that it

---

[7]  The Mutual Legal Assistance Treaty ("MLAT") between the United States and the Republic of Trinidad & Tobago does not encompass kidnappings, murders, hostage-takings, or the like.  Rather, in the criminal context, the MLAT is limited to drug dealing and money laundering offenses.  As a result, the Government could not have sought assistance via and MLAT.

[8]  Moreover, the Government did not oppose Mr. Suchit's Application for Letters Rogatory to the Republic of Trinidad & Tobago, despite the fact that much of the information sought went beyond what Mr. Suchit would ordinarily be entitled to receive.  The Government reserved its right to object to the disclosure of the unredacted information directly to the defendant and to object to its proper discoverablilty and timing of the disclosure.  However, the Government's decision not to object was based on its belief that it was better for the information to become available expeditiously in the United States (subject to future objections) than for the process of its recovery to be delayed while the parties briefed the issues, the Court heard arguments, and issued an Order on the subject.

would be available for Mr. Suchit.

For instance, but not by way of limitation, Mr. Suchit sought the **transcripts** of the extensive testimony in the Trinidadian *prima facie* (parallel) proceedings in *Constable Wendell Lucas v. Doreen Alexander Durity, et al*.  Certified copies of those transcripts were obtained by the Government and copies were provided to Mr. Suchit's counsel.   When the Court issued at Mr. Suchit's request **Letters Rogatory**[9] to the Republic of Trinidad & Tobago, the Government caused a letter to be issued from the United States Embassy in Trinidad & Tobago to the Minister of National Security of Trinidad & Tobago requesting each of the items sought in the Letters Rogatory.   The Government obtained copies of the Trinidad & Tobago Police Force ("TTPF") **Homicide Bureau's files**.   The Government obtained copies of the TTPF **Anti-kidnapping Unit's files**.   When Mr. Suchit's counsel indicated she was interested in the Station Diary from the Arouca Police Station, the Assistant United States Attorney and the FBI made a special trip to the Arouca Police Station and obtained (and produced) copies of various potentially material entries in the **Arouca Police Station Homicide Diaries**; which were the Diaries the Government understood Mr. Suchit desired.[10]   Thereafter, when Mr. Suchit's attorney indicated she was also

---

[9]  In the instant case, Mr. Suchit sought in late March of 2007 Letters Rogatory to the Republic of Trinidad & Tobago.  The issue of timeliness aside, this fact distinguishes Mr. Suchit's case from *United States v. Yousef*, 327 F.3d 56, 112-13 (2d Cir. 2003) ("The defendants focus the bulk of their due process complaints on the United States Government's alleged failure to help them obtain cooperation from Philippine authorities, which they allege significantly hindered their defenses . . . . [The defendant] cannot now be heard to complain about his inability to obtain [a videotape] when he did not use the tools at his disposal to seek the tape"); *United States v. Sensi*, 879 F.2d 888, 899 (D.C. Cir. 1989) (affirming the lower court's rejection of a motion for a new trial based on the Sixth Amendment where defendant failed to "use all the means at his disposal to obtain the needed testimony")

[10]  It goes without saying that a defendant may build his defense without disclosing his strategy and/or the use to which particular information might be put to the Government.

interested in any other Station Diaries at the Arouca Police Station, the Government immediately dispatched several FBI Agents back to the Arouca Police Station and obtained redacted portions of the **general Arouca Police Station Diaries**.[11]    Mr. Suchit has indicated he is interested in the **cellular telephone records** related to certain telephone numbers.  At the time in question, the only cellular telephone company in Trinidad & Tobago was "TSTT."  On information and belief, TSTT is a private company (*i.e.*, it is not a government agency.)   Beginning in approximately October of 2006, the Government has sought (for its own edification) copies of various telephone records from TSTT.  Despite Agent involvement and requests to (and through) the the Trinidadian Director of Public Prosecutions (the "DPP"),[12] the Government's efforts were

_____

However, when a defendant does so, he necessarily runs the risk that the Government will view his requests more narrowly than might the defendant.  Hence, because Mr. Suchit's attorney requested of the AUSA copies of the Arouca Station Diaries, and because at the suppression hearing the defendant put in issue whether he was taken to the Arouca Station Homicide Unit, the Government traveled to the Arouca Police Station late one night and sought and obtained copies of the Station Diaries for the Homicide Unit.  Only later, after the Homicide Unit's Diaries had been produced to her, did Mr. Suchit's attorney indicate that if there were other "Station Diaries" at the Arouca Police Station, she was interested contained therein, as well. The week Mr. Suchit's attorney made this supplemental request, FBI Agents made a special trip (during regular working hours) back to the Arouca Police Station to attempt to obtain the information.  However, the daytime TTPF Official at the Arouca Station would not permit the Agents to copy the entirety of the various pages sought, but would only allow the photographing fo redacted pages (the Official expressing a not unreasonable concern that privileged and/or confidential information in on-going investigations and/or informants might be compromised by such disclosure.)

[11]  Those redacted documents are awaiting a Protective Order prior to disclosure.  The Government requests that the Protective Order entered include, and be retroactive with regard to, the Arouca Police Station's Homicide Unit's Diaries, as well.

[12]  The Director of Public Prosecutions (Geoffrey Henderson, Esquire), is the chief prosecutor in Trinidad & Tobago and is roughly equivalent to the United States Attorney, but also being responsible for various responsibilities that would be the realm of the Attorney General of the United States, as well.

-10-

generally unsuccessful.  As a result, in early February of 2007, the United States Ambassador directed a letter to the Minister of National Security requesting the information from TSTT.  When the documents were still not forthcoming (despite repeated promises, the documents had not materialized), the DPP was requested to re-engage and he contacted the General Counsel of TSTT for assistance.  (According to the DPP, *in Trinidadian prosecutions* his Office relies <u>exclusively</u> on informal contacts and means of and for obtaining telephone record information from TSTT.)  Eventually, some -- but not all – of the requested information was produced by TSTT.

In approximately mid-April 2007, with trial then-scheduled to begin on April 30, 2007, the Government became aware that Mr. Suchit was interested in obtaining copies of the files of the Criminal Intelligence Unit ("CIU") (referred to in the Supplemental Motion as the Criminal Intelligence Division ("CID")).  At the April 18, 2007 status, a portion of which was conducted *ex parte* (involving the Court and Mr. Suchit, but excluding the Government), Mr. Suchit presumably informed the Court of the materiality of his request for **the CID/CIU "investigative files."**  On April 18, 2007, following the conclusion of the *ex parte* portion of the proceedings, the Court encouraged the Government to seek to determine whether the CID/CIU maintained files and, if so, if copies of the files could be obtained.  The Government undertook to so do.[13]  The Government timely provided Mr. Suchit with its best information: There is one CIU for the entire Trinidad & Tobago, located in Port of Spain.  The CIU does not undertake to investigate

---

[13]  There is an FBI Agent, who is the Assistant Legal Attache ("ALAT") to the U.S. Embassy at Trinidad & Tobago, who is resident in Trinidad & Tobago.  This Agent was requested to obtain this information.  In addition, other Agents (and this AUSA) sought through informal contacts with the TTPF to obtain the information.

crimes, but rather functions effectively as a clearinghouse for intelligence gathered from numerous confidential sources, including but not limited to Crimestoppers.  As a result, there are no "investigative files," *per se*; but there may be some form of notebooks or Diaries showing information coming into CIU (*e.g.*, from Crimestoppers) and to whom the information was routed (*e.g.*, to AKU, Homicide, Narcotics, etc.)  The Government continues to try to obtain copies of any pertinent information that may exist in such notebooks/Diaries, if any.

Hence, as set forth above, the Government has done all that it reasonably can do -- and more than it is obliged to do -- to obtain the information sought by Mr. Suchit in these proceedings.

**Evidence/Information in the Possession of,
or Reasonably Available to, the Government**

As previously established, all information and evidence in the possession of, or reasonably available to, the Government to which Mr. Suchit is (or will become) entitled has been (or will timely be) provided to him.  To the extent Mr. Suchit seeks matters beyond that which the Government's efforts have been able to obtain, those records are clearly not in the custody or control of the United States government.  Just as Mr. Suchit cannot require the United States to "ensure [his] access to witnesses outside the jurisdiction of the United States," *see United States v. Sensi*, 879 F.2d 888, 898 (D.C. Cir. 1989), he cannot *require* the United States to submit assistance requests to a foreign government on his behalf.  The United States cannot be compelled to gather evidence for the defendant from third parties, *see, e.g., United States v. Steurer*, 942 F. Supp. 1183, 1189-90 (N.D. Ill. 1996) (denying defendant's motion to compel production of *Brady* material that was in the possession of third parties), be they private entities or sovereign nations.

Yet, in this case, as established above, the Government has exceeded substantially, its obligations to Mr. Suchit and did vigorously pursue the information he requested.  If Mr. Suchit truly believes he needs additional information to fairly present his defense in this case, its strikes the Government Mr. Suchit has a choice to make:  Does he wish to proceed to trial with the available evidence,[14] or would he rather seek to continue his trial for a reasonable period of time to pursue the Letters Rogatory that were issued on April 2, 2007?  It would surely stand fairness on its head to permit Mr. Suchit to wait until late March of 2007 (with a then-April 30 trial date) to first seek Letters Rogatory and to then consider dismissing the charges against him because he does not have the information he seeks before his June 4, 2007 trial date, despite the substantial efforts on his behalf by the Government.

Because the United States has discharged its obligations in these proceedings, Mr. Suchit's Supplemental Motion is without merit and should be denied.

---

[14]  The Government is mindful that there could be good and substantial tactical reasons why Mr. Suchit would decide to press on to trial immediately.  For instance, Mr. Suchit is well-aware that four additional indicated co-conspirators have been ordered extradited to the United States; their appeals have been heard and rejected by the Trinidadian High Court, and their further appeals to the Court of Appeals are pending.   An additional four indicted co-defendants are beginning their extradition proceedings in Trinidad & Tobago.  Mr Suchit may not view it as being in his strategic interests to await additional potentially "helpful" evidence, when the delay may bring other of his co-conspirators to United States shores where one or more of them could potentially bear witness against him.

WHEREFORE, for each of the independent reasons set forth above, Defendant David

Suchit's Second Supplemental Motion to Dismiss Indictment Based Upon Due Process Violations

should be, in all things, denied.

          Respectfully submitted,

          JEFFREY A. TAYLOR (D.C. Bar No. 498610)
          United States Attorney

              /S/

By:    _____
          BRUCE R. HEGYI (D.C. Bar No. 422741)
          Assistant United States Attorney
          Federal Major Crimes Section
          555 Fourth Street, N.W., Room 4848
          Washington, D.C.  20530
          (202) 305-9637
          (202) 353-9414 (fax)
          www.bruce.hegyi@usdoj.gov


          JEANNE M. HAUCH
          Assistant United States Attorney
          National Security Section
          555 Fourth Street, N.W., 11th Floor
          Washington, D.C.  20530
          (202) 514-5776

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of May, 2007, a true and correct copy of the above and foregoing GOVERNMENT'S OPPOSITION TO DEFENDANT SUCHIT'S SECOND SUPPLEMENTAL MOTION TO DISMISS INDICTMENT BASED UPON DUE PROCESS VIOLATIONS and Exhibit was served on the following by First Class Mail, postage pre-paid, upon:

DIANE LEPLEY, ESQUIRE
400 SEVENTH STREET, N.W.
SUITE 400
WASHINGTON, D.C.  20004

/S/

_____
BRUCE R. HEGYI
Assistant United States Attorney