IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** § § § § | |
| - vs - § | CRIMINAL No.  06-102-02 (JDB) |
| § § | |
| **DAVID SUCHIT,** *el al.* § § | |
| Defendants. § § | |

### GOVERNMENT'S STATUS REPORT IN COMPLIANCE WITH
### THE COURT'S MAY 11, 2007 MINUTE ORDER

In compliance with the Court's Minute Order of May 11, 2007, the United States of America ("United States" or "Government") files this, its Status Report related to the information sought in defendant David Suchit's Letter's Rogatory to the Republic of Trinidad & Tobago. For purposes of clarity, the Requests will be reiterated in bold print, followed by the Government's explanation of its status. Because Paragraph "A. Documents Requested: Business Records" all relate to the telephone records of the Trinidadian telephone company, TSTT, they will be grouped together for response.[1] The request in Paragraph "B: Official Records" will individually, or in related groups, below.

---

[1] Mr. Suchit's Reply Memorandum [Document #91], filed on May 15, 2007, avers that "at all times, the defense has indicated that only certain limited items set forth in [Mr. Suchit's] international letter rogatory should be transferred to the Government's side for examination and production. Those specific items are those which are potentially exculpatory, in the possession of the Trinidad law enforcement officers with whom the United States was working and narrowed to a few sub-parts of the international letter rogatory," identifying thereafter only limited portions of the requests contained in Paragraph B "Official Records." [*See* Reply at 2.]

**Preliminary Statement**

In supplement to the authorities citing in the Government's Opposition to Second Supplement to Defendant's Motion to Dismiss Indictment for Due Process Violations [Document #90], the Government refers the Court to *United States v. Mejia*, 448 F.3d 436 (D.C. Cir. 2006) (Garland, J.),[2] *cert. denied*, 127 S.Ct. 989 (2007).  After reciting the settled principle that "[t]here is no general constitutional right to discovery in a criminal case," 448 F.3d at 444 (*quoting United States v. Ruiz*, 536 U.S. 622, 629 (2002), which quoted *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)), the Court rejected the defendants' claim that the Government was required to produce recordings made in a trial in Costa Rica of one of their alleged co-conspirators.  *Id*. at 444.  In so doing, the Court noted that neither the tapes nor transcripts of the trial were within the Government's possession, custody, or control, which would have triggered the Government's Rule 16(a)(1)(E) disclosure obligations.  *Id.*  Turning to the defendants' claim that the trial court abused its discretion when it summarily ruled that the Government "had no obligation to use its best efforts through the [MLAT] to obtain them" *Id.*  (quoting from Appellants' Brief.), the Court resolved:

> We do not agree.  <u>The government's obligation was to comply with Rule 16</u>, and there is no dispute that it did so.  <u>Having the authority "to seek" tapes or transcripts through a treaty is not the same thing as having "the power to secure" them</u>. [Citation omitted]   Moreover, we note that the government provided the defense with what it did have – summaries of the Morales Cooper trial [record citation omitted] – and that defense counsel traveled to Costa Rica to interview Morales Cooper, thus undermining any claim of prejudice.

448 F.3d at 436 (emphasis provided).

---

[2]  The Government intended to cite *Mejia* in its Opposition, which for logistical reasons it filed two days before it was due, and apologizes for the oversight.

In this case, the Government believes it has gone substantially beyond its obligations in an international prosecution.

REPORT ON STATUS

**A.     DOCUMENTS REQUESTED: Business Records** [3]
1. **Order the relevant businesses to produce certified true and correct copies of the following:**
   a..   **Telephone records of incoming and outgoing calls from March 1, 2005 through April 1, 2006 for the following telephone numbers:**
      1. **868-793-3301**
      2. **868-341-9234**
      3. **868-674-2495**
      4. **868-737-1734**
      5. **Any and all telephone numbers subscribed to by Neermal John, born in San Juan, Trinidad   (Please note that additional identifying information for this person may be obtained from the United States government by contacting the Assistant United States Attorney Bruce Hegyi at (202) 305-9637)**
      6. **868-768-8899**
      7. **868-667-8509**
      8. **868-824-8788**
      9. **868-800-1234**
      10. **cell phone records of p.c. Forbes #14551 used for business purposes only for the months of August, 2005 through April, 2006**
   b.   **Subscriber information for the above telephone numbers, listed in subparagraph (a), including the name to whom the telephone number is registered and the appropriate address and any other identifying information**
   c.   **Public telephone booth by the Licensing Authority in Arima, Trinidad from which calls were allegedly made by Anderson Straker, an indicted co-conspirator, during the months of March and April, 2005**
      i.   **Regarding subparagraph (c) above, please provide**

---

[3] The requests in the Letters Rogatory go beyond what Mr. Suchit would ordinarily be entitled in the United States.  Objection would be made to the production of these materials, if they existed and were produced, save as to the extent they would constitute *Brady*, *Giglio*, *Jencks*, or otherwise discoverable/producible information.

        **information about the telephone number (or numbers) of that public telephone booth and**
    ii.  **the repair record, and/or dates it was or was not in service for the above telephone number(s)**
  2.  **Have the person providing the documents attach a Certificate of Authenticity of Business Records (form provided).**
  3.  **Attach the completed certificate to the documents requested and provide the documents to the court.**

  STATUS:  The Government is advised by Mr. Geoffrey Henderson, the Director of Public Prosecutions ("DPP"), Republic of Trinidad & Tobago ("TT"), that the normal process followed in criminal prosecutions in TT by the Office of the DPP is that this sort of information is sought "informally" by the police and prosecutors in Trinidad. The Government is advised that the sole telephone company (at the time in question) in TT was "TSTT," which is a private concern. As a result, on April 4, 2007, this AUSA and Special Agents from the FBI met with a member of the TTPF, provided him with a copy of the Letters Rogatory from Mr. Suchit's then-pending application for Letters Rogatory, and requested that he use his best efforts to obtain them informally from TSTT. The TTPF has not yet received the records from TSTT. More recently, the US Embassy in Trinidad sent a letter to the Minister of National Security requesting the information, as well. The Government notes that this procedure is similar to the one employed by it in its attempts to obtain from TSTT telephone records of interest to it: The US Attorney's Office first requested information from the FBI ALAT at the US Embassy on its behalf in approximately October of 2006. Eventually, a letter was sent from the US Embassy on February 2, 2007 to the TT Minister of National Security. On April 23, 2007, the Government received a batch of data from TSTT related to five (5) of the twelve (12) telephone numbers the Government sought in October 2006. On May 14, 2007, the Government received an additional

batch of date from TSTT related to an additional 2-3 of the twelve telephone numbers sought by the Government and was advised that TSTT would not have any call information for the remaining numbers as they numbers were from pre-paid cellular phones as to which TSTT has a very short retention policy.

<u>Stipulation</u>

Moreover, the Government and Mr. Suchit's attorney have sought to – and believe they will be able to – work out a stipulation with regard to the underlying issue of Mr. Suchit's call(s) to Crime Stoppers.[4]

**B.   <u>Official Records</u> [5]**
   **1.   Order the relevant Government or law enforcement authorities to produce certified true and correct copies of the following:**
      **a.   criminal arrests, detentions, and convictions, if any, of the defendant, David Suchit, his wife Leera Suchit, and his brother Wayne Suchit**
      **b.   criminal arrests, detentions, and convictions, if any, of the person, Neermal John, the victim's brother in this case (identifying information to be provided by the United States government's prosecutor Bruce Hegyi at (202) 305-9637)**
      **c.   police records of Neermal John (see above) including but not limited to, Orders to Open Investigation, arrest warrants, documents supporting arrest warrants, arrest records, charges filed, documents supporting arrest warrants, arrest records, charges filed, documents supporting charges filed, investigative**

---

[4] On May 14, 2007, Mr. Suchit's attorney forwarded a proposed stipulation, which the attorneys discussed that evening. On May 15, 2007, the Government forwarded to Mr. Suchit's attorney its proposed stipulation on this issue. On May 15 and May 16, counsel consulted as to their respective concerns with the language in the Government's proposed stipulation, the result of which is that counsel believe they will ultimately be able to come to an agreement on a stipulation.

[5] The requests in the Letters Rogatory go beyond what Mr. Suchit would ordinarily be entitled in the United States. Objection would be made to the production of these materials, if they existed and were produced, save as to the extent they would constitute *Brady*, *Giglio*, *Jencks*, or otherwise discoverable/producible information.

**files, and records of disposition of the charges**

STATUS: As previously indicated, on April 12, 2007 the US Embassy in Trinidad & Tobago a letter to the TT Minister of National Security requesting each of these items of information. In addition, requests have been made informally to members of the TT Police Force. The arrest information for David Suchit was provided with initial discovery in this matter. The Government has not received any positive response concerning the TT arrests and/or convictions of Leera Suchit, Wayne Suchit, or Neermal John, if any.

    **d.    all public records relating to the recent arrest and/or investigation or conviction of defense attorney Gokool who was appointed to represent David Suchit during the proceedings in Trinidad and Tobago**

STATUS: These records were also requested of the TT Minister of National Security in the April 12, 2007 letter. In addition, during the week of April 2, 2007, this AUSA and members of the FBI met personally with the DPP and requested this information. The DPP provided his understanding of the charge against attorney Gokool (*i.e.*, creation and/or use of a fraudulent affidavit in a criminal matter unrelated to this case), which information was timely provided to Mr. Suchit's attorney.

    **e.    all transcripts relating to the proceedings in the Magistrates' Court of Trinidad and Tobago, Case #1134/06, entitled PC Wendell Lucas #13375 v.Doreen Alexander-Durity, et al.and all declarations of the person(s) transcribing the proceedings certifying their accuracy**

STATUS: During the week of April 2, 2007, this AUSA and members of the FBI met personally with the DPP and requested this information. In addition, these records were also requested of the TT Minister of National Security in the April 12, 2007 letter from the US

Embassy. In approximately the third week of April 2007, certified copies of the entire transcript of these proceedings in Trinidad were produced to the Government. Thereafter, the Government prepared copies of the entire transcript and produced it to Mr. Suchit's attorney.

    **f.**    **transcript of the testimony of David Suchit for all hearings in which he testified in the criminal case involving the prosecution of Vijay Mungroo and others for the kidnapping and murder of Edmund Mitchell on or about January 10, 1990**

– and --

    **g.**    **statements made by David Suchit to the police and/or other government authorities about the murder of Edmund Mitchell on or about January 10, 1990 in Trinidad, including any reports about those statements or notes taken in connection with the interviewing of Mr. Suchit or the reporting of his statements**

STATUS: These records were also requested of the TT Minister of National Security in the April 12, 2007 letter. In addition, during the week of April 2, 2007, this AUSA and members of the FBI met personally with the DPP and requested this information. The DPP advised that, after 1990, there was an attempted *coup* in Trinidad & Tobago and that the armed insurgents took control of, among other places, the court house and that the court records had been burned. However, the DPP thought that the records had been reconstructed from their original sources and therefore the information might be obtainable. In addition, informal requests were made of members of the Trinidad & Tobago Police Force ("TTPF") for any statements of Mr. Suchit relating to the murder of Edmund Mitchell. In early May 2007, this AUSA communicated with the DPP inquiring of the status of the transcripts and/or statements. None have yet been provided.

    h.  statements, including any notes and reports by Trinidad law enforcement officers, made by Neermal John, the victim's brother, about David Suchit and/or the investigation of the kidnapping and death of his brother, Balram Maharaj

STATUS: These records were also requested of the TT Minister of National Security in the April 12, 2007 letter. In addition, informal requests have been made to TTPF personnel. The Government has been provided with copies of this information.

    i.  all records and statements about David Suchit's participation in a type of Witness Protection program and/or records kept about his assistance with the Trinidad authorities

STATUS: Early in this case, the Government was provided with copies of these documents which were, in turn, provided to Mr. Suchit's attorney in discovery. Copies of these documents were introduced at the February 12-13, 2007 Suppression Hearing in this case. Nevertheless, these records were also requested of the TT Minister of National Security in the April 12, 2007 letter from the US Embassy. In addition, informal requests have been made to TTPF personnel in an effort to determine if any other records exist. The Government has received, and has reviewed, copies of the TTPF Anti-kidnapping Unit's files and copies of the TTPF Homicide Unit's files related to the investigation into the kidnapping of Balram Maharaj.

    j.  station house diaries, abstracts and/or logs of people located at the Arouca Police Station for these days:
      1. October 2-4, 2005
      2. January 2-9, 2006
      3. January 15-18, 2006 [6]
      4. February 15-18, 2006

STATUS: These records were also requested of the TT Minister of National Security

---

[6] January 15-18, 2006 is an extraneous (and erroneous) time frame and is presumably based upon the typographical error in an FBI-302. The typographical error was explained at the February 12-13, 2007 Suppression Hearing.

in the April 12, 2007 letter from the US Embassy. Moreover, on the night of April 4, 2007, this AUSA, several FBI Agents, and a member of the TTPF, traveled to the Arouca Police Station and informally requested authority to photograph the related pages of the Homicide Unit Station Diaries (which were the Diaries this AUSA believed were being sought by Mr. Suchit's attorney.)[7] Informal permission was granted by the night supervisor of the Homicide Unit. As a result, the FBI reviewed the Homicide Unit's Station Diaries and found that they contained four (4) references to Mr. Suchit; three of those references were from January 8, 2006 and one of the references was from January 9, 2006. Nevertheless, the FBI photographed pages of the Homicide Unit's Station Diaries for each of the days in question. On Monday, April 9, 2007, on this AUSA produced to Mr. Suchit's attorney the digital photographs of the pages of the Homicide Unit's Station Diaries. During the week of April 9, 2007, following this AUSA's return to the United States from Trinidad & Tobago, Mr. Suchit's attorney specifically requested copies of the (general) Station Diaries from the Arouca Police Station for the identified days, as well. As a result, on April 12, 2007, two Miami-based FBI Special Agents and a member of the TTPF returned to the Arouca Police Station during the day time and requested permission to

---

[7] Prior to this AUSA's trip to Trinidad & Tobago beginning on April 1, 2007, Mr. Suchit's attorney and this AUSA had numerous conferences concerning information and/or documentation that the defense was interested in obtaining from Trinidad & Tobago, including but not limited to, the information eventually sought in the Letters Rogatory that were issued on April 5, 2007. As a result, during the April 1-6 trip to Trinidad & Tobago, this AUSA and the FBI Agents sought to obtain for the defense information he understood they were interested in securing, including (among other things) information/documentation in the not-yet-issued Letters Rogatory. In this regard, according to Mr. Suchit's statements, in 2005-06, he was taken to (or went to) the Homicide Unit at the Arouca Police Station. As a result, the Homicide Unit's Station Diaries were the Diaries requested by the Government. In fact, as set forth above, the Homicide Unit's Diaries do contain various entries related to Mr. Suchit's presence at the Homicide Unit. A check of the (general) Station Diaries for the Arouca Police Station conducted the next week located no entries related to Mr. Suchit on any of the dates in question.

photograph the corresponding pages of the (general) Station Diaries.  The TTPF Official on duty (Superintendent N. Kahn) stated he was unable to grant the request for fear of disclosing and compromising confidential information in *other* investigations.[8]  In the presence of FBI personnel, Superintendent Kahn and TTPF Cpl. Lucas examined the entries in the (general) Station Diaries for the days in question, searching for any reference to Mr. Suchit.  There was no reference to Mr. Suchit in the (general) Station Diaries on the days in question.  Nevertheless, a request was made to photocopy the corresponding pages of the (general) Station Diaries, which request was denied because of the security concerns set forth above.  To that end, the Government thereafter raised with Mr. Suchit's attorney its desire to obtain a Protective Order that might assuage the concerns of the TTPF as to the (general) Station Diaries and that would encompass  the information in the Homicide Unit's Diaries previously provided.[9]

---

[8] The Station Diaries are extremely large, bound, hard-covered, ledger-type books containing lined and sequentially numbered pages.  The entries in these Diaries are made by hand and are in chronological order, setting forth sequentially the activities related to the particular TTPF unit or group.  As a result, as confirmed by the pages of the Arouca Homicide Branch's Diaries previously provided to Mr. Suchit, the Diaries indeed contain confidential information about on-going investigations.  Names of individuals are recorded, reference to individuals as "informants" on recorded, as well as personal identifying information with regard to witnesses, complainants, suspects, and related information in on-going criminal investigations.

[9] The Protective Order requested would limit the dissemination of the information ***about Mr. Suchit*** to Mr. Suchit's attorney, Mr. Suchit, and Mr. Suchit's investigator (Brad Davidson), without prior leave of court.  Moreover, it would limit dissemination of any information contained in the (unredacted) pages of the Homicide Station Diaries to Mr. Suchit's attorney and his investigator, without prior leave of Court.  The general issue of a protective order related to these documents was raised in passing with the Court at the April 18, 2007 status at which point the Court opined that the content of a protective order could be resolved.

      **k.**      **all of the investigative files and reports of law enforcement authorities relating in any way to the kidnapping of Balram Maharaj and the prosecution of Mr. Suchit and others for associated crimes**

STATUS:    These records were also requested of the TT Minister of National Security in the April 12, 2007 letter from the US Embassy. Copies of the files of the TTPF Anti-kidnapping Unit have been obtained, as have copies of the files of the TTPF Homicide Unit. In addition, in a separate letter, the US Embassy in Trinidad specifically requested of the TTPF Assistant Chief of Police who is responsible for the Criminal Intelligence Unit access to the CIU's responsive records, if any. Moreover, on May 10, 2007 a Trinidad-based FBI ALAT and a Miami-based FBI Agent met with the TTPF Assistant Chief of Police ("ACP") in the ACP's office and discussed at length this request with the ACP. Further, on Saturday, May 12, 2007 the FBI ALAT discussed this matter again with the ACP. At this point, it is believed that the Government may be provided with copies of the CIU records, if any, related to information that may have been provided by Mr. Suchit to TT Crime Stoppers that was, in turn, passed to CIU, if any. There is hope, but no guarantee, that the information will be forthcoming in the week of May 21, 2007.

ADDITIONAL MATTER

     In her March 22, 2007 discovery request letter, Mr. Suchit's attorney requested, among other things, documentation concerning Anderson Straker's travel in May of 2005, from Trinidad & Tobago to and from Canada. Shortly after the Request, the Government provided Mr. Suchit's attorney with the informal information it had previously obtained and offered to explore entering into a stipulation with Mr. Suchit in conformity with the informal information it received.

Thereafter, the Government transmitted a Mutual Legal Assistance Treaty ("MLAT") request to the Canadian government seeking information related to the entry into and exit from Canada by Anderson Straker in or about May of 2005. Based on a May 16, 2007, communication between the Department of Justice Office of International Affairs and its Canadian counterpart, there is hope, but no guarantee, that the information will be forthcoming by the end of the week of May 25, 2007.

       Respectfully submitted,

       JEFFREY A. TAYLOR (D.C. Bar No. 498610)
       United States Attorney

       /S/

By: _____
       BRUCE R. HEGYI (D.C. Bar No. 422741)
       Assistant United States Attorney
       Federal Major Crimes Section
       555 Fourth Street, N.W., Room 4848
       Washington, D.C. 20530
       (202) 305-9637
       (202) 353-9414 (fax)
       www.bruce.hegyi@usdoj.gov


       JEANNE M. HAUCH
       Assistant United States Attorney
       National Security Section
       555 Fourth Street, N.W., 11th Floor
       Washington, D.C. 20530

CERTIFICATE OF SERVICE

      I hereby certify that on this 17th day of May, 2007, a true and correct copy of the above and foregoing GOVERNMENT'S STATUS REPORT was served on the following by First Class Mail, postage pre-paid, upon:

> DIANE LEPLEY, ESQUIRE
> 400 SEVENTH STREET, N.W.
> SUITE 400
> WASHINGTON, D.C.  20004

      /S/

_____
BRUCE R. HEGYI
Assistant United States Attorney